**Deborah Gail PERSLEY, Plaintiff,**

v.

**NATIONAL RAILROAD PASSENGER CORPORATION, Defendant.**

Civ. No. H–92–2943.

United States District Court,
D. Maryland.

June 16, 1993.

Gerald F. Gay and Arnold, Bacot, Gay & Tingle, Baltimore, MD, for plaintiff.

Stephen D. Caplis, Jr. and Whiteford, Taylor & Preston, Baltimore, MD, for defendant.

*MEMORANDUM OPINION*

ALEXANDER HARVEY, II, Senior District Judge.

This civil action arises as a result of an assault upon plaintiff Deborah Gail Persley by a fellow employee, Daniel Foster. At the time of the assault, both Persley and Foster were employed by defendant National Railroad Passenger Corporation ("Amtrak"). Plaintiff has not here sued Foster but has brought this action against Amtrak under the Federal Employers' Liability Act, 45 U.S.C. § 51 *et seq.* ("FELA"), alleging that the assault was caused in part by the negligence of Amtrak.

Presently pending is defendant's motion for summary judgment. The Court has considered memoranda and a number of depositions submitted both in support of and in opposition to the pending motion. The pertinent facts have been fully developed by the depositions and other discovery. Oral argument has been heard in open court. For the reasons to be stated, the Court has concluded that defendant's motion for summary judgment must be granted.

I

*Background*

Plaintiff began working for Amtrak in October of 1989. Her position was as an "on-board service attendant," a job which re-

quired her to tend to the needs of Amtrak passengers. All of the events relevant to the pending motion occurred on or before December 8, 1989, the date of the assault. Considered in a light most favorable to plaintiff, the record currently before the Court evidences the following facts.

Plaintiff's employment "base" was in Washington, D.C. She worked aboard trains originating in Washington and traveling to various other cities throughout the country. Prior to December 8, 1989, plaintiff had allegedly been subject to verbal abuse by various male employees of Amtrak. Plaintiff never complained of this abuse to any of her superiors. No Amtrak employee had ever previously threatened to assault plaintiff.

Plaintiff's first contact with Foster occurred approximately two weeks prior to the assault. Both plaintiff and Foster were working aboard a train which was making a round trip from Washington to Chicago. Foster, who had been employed by Amtrak for approximately five years, worked at that time in the dining car. When they first met, plaintiff and Foster discussed their common interest in music. At that time, plaintiff's impression of Foster was that he was "a very nice guy." At her deposition, plaintiff testified that during this trip Foster neither said nor did anything offensive.

Plaintiff's next contact with Foster apparently occurred during another round trip on the Washington–Chicago route. It was during this trip that the assault occurred. On this trip, plaintiff was assigned to a particular sleeper car. Within the sleeper car, plaintiff was assigned her own "roomette," in which she could rest during her breaks. A number of other employees, including Foster, were also assigned roomettes in the same car.

According to plaintiff, a number of incidents which occurred during this trip presaged the assault. Plaintiff was told by a third person that Foster had inquired as to whether plaintiff had a child. When Foster was informed that plaintiff did have a child, Foster allegedly stated that he could tell "because of the gap between [her] legs." Plaintiff confronted Foster concerning this remark, at which time Foster "giggled."

However, plaintiff testified that following this confrontation "everything was fine," and that she did not feel any fear or apprehension related to Foster. At the time, plaintiff did not report this incident to any supervisor.

During a delayed layover in Chicago, a number of Amtrak employees had gathered and were dancing to music. Plaintiff testified that Foster was "a little vulgar in his dancing," and that he was "exercising his hips a little bit more than just a regular dance calls for." Plaintiff testified that she backed away from Foster, after which Foster did not bother her. At the time, plaintiff did not report this incident to any supervisor.

Sometime later during the trip, Foster and plaintiff were passing in a hallway of the train. As is required of Amtrak employees, they passed back-to-back. At that time, Foster pinned plaintiff to the wall by pressing his buttocks against her. When plaintiff protested, Foster laughed, and then eventually released her. At the time, plaintiff did not report this incident to any supervisor.

At a later point in this trip, plaintiff was helping a number of passengers board the train. As she walked down the hall of the sleeper car, she noticed Foster sitting in his roomette. He did not have a shirt on, and was wearing only his underwear. As she passed, he was calling her name. Afraid that the passengers would see Foster in this condition, plaintiff quickly hurried past his room. Again, at the time, she did not report this incident to any supervisor.

Soon after this incident, plaintiff was resting in her roomette when Foster began to pull on the "call bell" which is used by passengers to summon on-board service attendants. Plaintiff did not respond to the bell. A conductor named Richard Meehan came by and asked plaintiff why she was not responding to the bell. Plaintiff informed Meehan that she believed that it was Foster who was ringing the bell. Meehan continued down the hall, and plaintiff heard Meehan speaking to Foster. At that point, the bell ceased to ring. The bell ringing incident apparently did not cause plaintiff to have any great concern. When the bell stopped ringing,

plaintiff "dismissed the whole thing and proceeded to go to sleep."

The assault occurred soon after the bell ringing incident. Plaintiff was resting in her roomette, but was not fully asleep. She was lying face down on her bed and was fully clothed. As was required by her job, the door to her roomette was open, although the opening was covered by a curtain with a zipper down the middle.[1] Plaintiff heard Foster in the hallway outside of her roomette. He was calling her name. Foster then entered the roomette and zipped the curtain closed behind him.

At her deposition, plaintiff testified that it was customary for co-workers to enter each other's rooms to talk. She stated that, "your room becomes your office when you're on the train." When asked whether she had any reason to tell Foster to leave her roomette at the time he entered, plaintiff stated, "Not at the present time, no." Plaintiff was asked, "So, all the prior incidents notwithstanding ... you didn't have any problem with him being in your room at this point?" Plaintiff responded simply, "No."

Plaintiff testified that after Foster entered her roomette, the next thing that she remembers is that Foster was lying on her back. Foster was "feeling all over [her] body," and at one point allegedly penetrated plaintiff's vagina with his fingers. Plaintiff repeatedly told Foster to stop what he was doing and to leave her roomette. Foster ignored these requests. Finally, plaintiff told Foster that if he did not stop, she would scream. At this, Foster removed himself from plaintiff's back and left the roomette.

As he was leaving the roomette, Foster was met by James Sullivan, who was the chief of on-board services. Sullivan was headed towards plaintiff's roomette to have a work-related discussion with her. Plaintiff testified that she heard Foster and Sullivan engage in a brief discussion, and then heard them laughing. Sullivan then entered plaintiff's roomette. Plaintiff immediately informed Sullivan that she wished to file a charge against Foster. According to plaintiff, Sullivan then stated something to the effect that, "If you two were having sex ... that's okay." However, when plaintiff persisted, Sullivan began to take the situation more seriously. Later during the trip, he did in fact bring plaintiff the forms necessary for the filing of a formal complaint against Foster.[2]

Plaintiff's final contact with Foster occurred when the train was coming back into Washington. As was customary at the end of a run, the Amtrak employees were gathered in the kitchen area of the dining car. Foster handed plaintiff a handwritten note. The note contained a phone number at which Foster could be reached, and stated, "Looking at the snow outside the only thing I can think about is how hot my passion is. Or should I say 'our passion.' Call me, o.k.?" And then in a post-script, the note stated, "Yes, I am very bold and brave. And honest." At her deposition, plaintiff was asked how she reacted to Foster's note. Plaintiff stated, "I did try to pretend like I wasn't going to—wasn't going to do anything about it. I didn't want to, you know, rev him up or anything." Plaintiff was also asked whether she had ever done anything to encourage Foster to think that there was the possibility of a romantic relationship between him and the plaintiff. The plaintiff responded, "No, I did not."

In addition to the various enumerated contacts between plaintiff and Foster, plaintiff also testified to an incident which occurred between Foster and plaintiff's roommate, Irania Bell, who was also employed by Amtrak. According to plaintiff, Bell had once told her of an incident, occurring prior to December 8, 1989, in which Foster had made sexual advances upon Bell. Neither Bell nor plaintiff ever reported this incident to any Amtrak supervisor.

---

1. Plaintiff testified that she was required to leave the door to her roomette open so that she could hear if a passenger called for her.

2. Soon after the alleged assault, Amtrak did in fact schedule a hearing on plaintiff's charge. However, the hearing itself was never held. On the morning of the hearing, Foster agreed to resign his position with Amtrak. The parties have not been able to determine Foster's whereabouts, and his deposition has not been taken in this case.

The record currently before the Court contains evidence of Foster's prior employment history with Amtrak. At least two of Foster's supervisors, Sullivan and Eunice Murray, who at the time of the incident was a train manager, stated that Foster was "flirtatious," with both co-workers and passengers. Sullivan characterized Foster as a "womanizer," but "in a non-aggressive manner." Murray had once disciplined Foster for fraternization with a female passenger.[3] Sullivan considered Foster to be a "high maintenance employee" who "required small corrective action." There is no evidence in the record indicating that, prior to December 8, 1989, Foster had ever engaged in sexual harassment, or assault of any type, or that he had ever been disciplined for conduct of this sort.

At her deposition, plaintiff testified that she believed that the alleged assault might not have occurred if the roomette to which she was assigned had been equipped with a radio or other device for communicating with other employees or supervisors on the train. Plaintiff stated that "[l]ooking back at it, had I had some kind of component to interact with people, chances are he wouldn't have even bothered me because he knew that device was in there." Noticeably absent from the record before the Court is any evidence that any employee had ever requested such a device prior to December 8, 1989, or that Amtrak was or should have been aware of any prior sexual assault perpetrated in a roomette or elsewhere on a train by a male employee against a female employee.

## II

### Summary Judgment Standards

As set forth in Rule 56(c), F.R.Civ.P., the standard for the granting of a motion for summary judgment is that the moving party must show "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." One of the purposes of Rule 56 is to require a party, in advance of trial and after

a motion for summary judgment has been filed and supported, to come forward with some minimal facts to show that it may not be subject to the defenses asserted. *See* Rule 56(e). A "mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely." *Barwick v. Celotex Corp.*, 736 F.2d 946, 958–59 (4th Cir.1984) (quoting *Seago v. North Carolina Theatres, Inc.*, 42 F.R.D. 627, 640 (E.D.N.C.1966), *aff'd*, 388 F.2d 987 (4th Cir. 1967)). In the absence of such a minimal showing, a party moving for summary judgment should not be required to undergo the expense of preparing for and participating in a trial of the issue challenged. As Judge Winter said in *Bland v. Norfolk and Southern Railroad Company*, 406 F.2d 863, 866 (4th Cir.1969):

> While a day in court may be a constitutional necessity when there are disputed questions of fact, the function of a motion for summary judgment is to smoke out if there is any case, *i.e.*, any genuine dispute as to any material fact, and, if there is no case, to conserve judicial time and energy by avoiding an unnecessary trial and by providing a speedy and efficient summary disposition.

In two cases decided in 1986, the Supreme Court clarified and expanded the principles applicable to a trial court's consideration of a motion for summary judgment filed under Rule 56. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In *Anderson*, the Supreme Court held that the standard for granting a motion for summary judgment under Rule 56 is the same as that for granting a directed verdict under Rule 50, F.R.Civ.P., 477 U.S. at 250–51, 106 S.Ct. at 2511–12. The Court explained this standard as follows:

> [T]he judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-

---

3. Foster was off duty, out of uniform, and not in his room. He was chatting with a female passenger. Murray instructed Foster to get about his business. As Murray was walking away, Foster walked with her and "gave [her] a little lip."

Murray charged Foster with discourtesy towards a supervisor, and with fraternization. This incident did not involve any harassment of or assault upon the female passenger.

minded jury could return a verdict for the plaintiff on the evidence presented. *The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient;* there must be evidence on which the jury could reasonably find for the plaintiff.

*Id.* at 252, 106 S.Ct. at 2512 (emphasis added).

In *Catrett,* the Court held that there is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar material *negating* the opponent's claim." 477 U.S. at 323, 106 S.Ct. at 2553 (emphasis in original). In reaching this result, the Court observed:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rule as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.Rule Civ.P. 1; ... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Id.* at 327, 106 S.Ct. at 2555.

The party moving for summary judgment has the burden to show that no genuine issue of fact exists and that the movant is entitled to judgment as a matter of law. *Barwick,* 736 F.2d at 958. The facts and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985). Nevertheless, the Fourth Circuit has stated that, with regard to motions for summary judgment, trial judges have "an affirmative obligation ... to prevent 'factually unsup-

ported claims and defenses' from proceeding to trial." *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987) (quoting *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553).

Pursuant to these authorities, the issue presented by the pending motion is whether or not plaintiff has produced any evidence upon which a reasonable factfinder could conclude that defendant Amtrak was negligent in producing the injury suffered by plaintiff. *See Rogers v. Missouri Pacific R.R. Co.,* 352 U.S. 500, 506–507, 77 S.Ct. 443, 448–449, 1 L.Ed.2d 493 (1957).

## III

### *Discussion*

In a FELA case in which the plaintiff's injuries have been intentionally inflicted by a co-employee, a plaintiff may recover under either of two theories: (1) that the employer is directly negligent for failing to prevent the foreseeable assault; or (2) that the assault was perpetrated within the fellow employee's scope of employment and in furtherance of the employer's business. *Sowards v. Chesapeake & Ohio Ry. Co.,* 580 F.2d 713, 715 (4th Cir.1978); *Lancaster v. Norfolk & Western Ry. Co.,* 773 F.2d 807, 818 (7th Cir.1985), *cert. denied,* 480 U.S. 945, 107 S.Ct. 1602, 94 L.Ed.2d 788 (1987). In this case, plaintiff is proceeding under a theory of direct negligence.[4] Accordingly, in order to prevail in this case, plaintiff must show that the alleged assault was foreseeable and that defendant could reasonably have prevented the assault.

Plaintiff has produced no evidence that Foster's alleged assault was foreseeable. There is no evidence in this record indicating that prior to December 8, 1989, Foster had ever committed any act even arguably similar to a sexual or other assault. The record does not disclose that Foster had a history of violent acts or of sexual harassment or that his supervisors were aware of facts which would have led them to suspect that he might

4. Neither in the complaint nor in the opposition to the pending motion, nor at oral argument, did plaintiff contend that Foster was acting within the scope of his employment when he assaulted her. In any case, no evidence has been present-

ed to support such a contention. "[W]here one employee assaults another employee for the sole purpose of satisfying his own temper or spite, the employer cannot be held liable for such a wanton act." *Sowards,* 580 F.2d at 715.

engage in such conduct.[5]  At the most, Foster had a reputation with a number of his supervisors of being "flirtatious" and a "womanizer."  However, Foster's reputation in this regard cannot reasonably be construed as making foreseeable to Amtrak that he would sexually assault a co-employee, or as imposing any sort of duty upon Amtrak to fire him or to take supervisory measures to prevent such an assault.

As to the various incidents which occurred on the day of the assault, it is undisputed that, with the exception of the bell ringing, no Amtrak supervisor knew of any of the incidents.  Even if supervisory personnel of Amtrak were aware of all of the various incidents, Foster's assault could not reasonably be said to have been foreseeable.  Plaintiff herself testified to the fact that, until the moment that the assault actually occurred, she had no reason to fear Foster.  "A railroad has no liability for an assault by one employee upon another in the absence of notice of the assaulter's 'vicious propensities.' "  *Green v. River Terminal Ry. Co.,* 763 F.2d 805, 808–809 (6th Cir.1985).  Since plaintiff has produced no evidence that the alleged assault was foreseeable, no genuine issue of material fact is presented concerning this issue.

At her deposition, plaintiff suggested that defendant was negligent in failing to provide a radio or other device for communicating with other employees on the train.  At the hearing on the pending motion, plaintiff's counsel conceded that he could not in good faith press such a claim absent evidence that Amtrak knew or should have known that one of its employees would be assaulted in a roomette.  The Court would agree.  There is no evidence in the record indicating that prior to December 8, 1989, any Amtrak employee ever requested such a device, that prior to this date Amtrak was aware of other assaults which had occurred in a roomette, or that any other circumstances existed which should have made such an assault foreseeable.  Absent such evidence, Amtrak cannot

be said to have been under any legal duty to take any action of this sort to prevent such an assault.  Thus, no genuine issue of fact is presented in this case concerning this issue.

### IV

#### · *Conclusion*

In sum, plaintiff has presented no evidence that either this specific assault or an assault of this kind upon an employee was foreseeable by Amtrak prior to Foster's assault upon plaintiff.  Thus, there is no evidence in the case to support a finding that Amtrak negligently failed to prevent this alleged assault.  Accordingly, defendant's motion for summary judgment will be granted.

An appropriate Order will be entered by the Court.

---

**5.**  The only even arguable exception to this may be Foster's alleged sexual advance upon plaintiff's roommate, Irania Bell.  There is some question whether the Court may even consider this evidence since it appears to be hearsay.  In any event, this incident is not relevant to the issue of whether Foster's assault was foreseeable to Amtrak, inasmuch as the incident was never reported to any Amtrak supervisor.