**Corinne WAHLSTROM, Plaintiff,**

v.

**METRO–NORTH COMMUTER RAIL-ROAD COMPANY and William Chapman, Defendants.**

**No. 96 Civ. 3589(PKL).**

United States District Court,
S.D. New York.

April 6, 2000.

508

Alterman & Boop P.C., New York City, Nina Koenigsberg, of counsel, for Plaintiff.

Hoguet Newman & Regal, LLP, New York City, Andrew M. Dansicker, of counsel, for Defendant Metro–North Commuter Railroad Company.

Farrauto, Berman, Fontana & Selznick, Yonkers, NY, Lawrence J. McElroen, of counsel, for Defendant William Chapman.

## OPINION AND ORDER

LEISURE, District Judge.

Plaintiff Corinne Wahlstrom brings this action, alleging that she was verbally and physically assaulted by a fellow employee, defendant William Chapman ("Chapman"). Plaintiff seeks relief against her employer, defendant Metro–North Commuter Railroad Company ("Metro–North"), under the Federal Employers' Liability Act, as amended, 45 U.S.C. § 51 *et seq.* ("FELA"), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law § 296(1)(a) ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8–107.1(a) ("NYCHRL"). Against Chapman, plaintiff has alleged common law tort claims—namely assault, battery, intentional infliction of emotional distress, negligent infliction of emotional distress, and *prima facie* tort. Following discovery, both defendants moved for summary judgment. For the reasons set forth below, the defendants' motions are granted in part and denied in part.

## BACKGROUND

Plaintiff has been employed by Metro–North's Transportation Department since June 1986. *See* Third Am. Compl. ¶ 21; Wahlstrom Dep. at 72–73. Since July 1987, she has served as both an assistant conductor and a conductor, depending on her schedule and availability. *See* Wahlstrom Dep. at 74–76.

On April 22, 1996, plaintiff was working her third assignment of the day, as an assistant conductor on Train 552, due to arrive in New York City's Grand Central Station at 11:52 a.m. *See* Third Am. Compl. ¶ 22; Wahlstrom Dep. at 172, 174–176. Also assigned to the train were defendant Chapman, the engineer; Timothy Gershner, the conductor; and Giusseppe Nicotra, the junior assistant conductor. *See* Wahlstrom Dep. at 173–80. As an assistant conductor, plaintiff reported to the

conductor and also assisted the engineer. *See id.* at 76.[1]

While the train was waiting in railroad yard at Metro–North's North White Plains station, and before passengers had boarded, *see id.* at 177, plaintiff struck up a conversation with Chapman, with whom she had occasionally worked in the past. *See id.* at 49–52. She inquired about his recent vacation to Aruba with his wife. *See id.* at 189–90. In an abrupt retort, Chapman allegedly replied, "Why the fuck do you want to know? Are you going to give me fucking sex?" *Id.* at 190; *see also id.* at 198–99. A bit shocked, Wahlstrom responded, "No. We are here on professional terms," *id.* at 199, and walked away toward the front of the train, *see id.* at 199–200, 249, 446. Nicotra, who had been sitting across from Chapman, observed the entire confrontation. *See id.* at 181–82; *see also* Nicotra Dep. at 17.

With plaintiff's back turned, Chapman then allegedly arose from his seat and came up behind her. *See* Nicotra Dep. at 48; Wahlstrom Dep. at 252. According to plaintiff, he wrapped his arms around her, grabbed her in a "bear hug," made a grunting sound, and slapped her left buttock three times. *See* Wahlstrom Dep. at 201, 252–54, 259, 275. Plaintiff forcefully pushed Chapman away and told him to get away from her, before fleeing toward the vestibule area of the train. *See id.* at 254, 257, 262. Despite being upset and nervous, she continued to perform her duties to prepare the train for its departure. *See id.* at 263–65.

Two or three minutes later, Chapman noticed plaintiff supervising Nicotra, who was lining switches for the track. *See id.* at 267. He ordered her to close the train door and shouted, "What are you doing standing there with your thumb up your ass?" *Id.* at 267. After moving the train up to the signal in the yard, Chapman yelled out, "What are you stupid, bitch?" [2] *Id.* at 268; *see also* Third Am. Compl. ¶ 25. Again, plaintiff continued to do her job, though she claims she collected fewer tickets than she normally did. *See* Wahlstrom Dep. at 273.

Chapman did not say anything else inappropriate during the rest of the ride. *See id.* at 270. However, after the train reached New York City's Grand Central Station and plaintiff began her walk up the ramp toward the terminal, Chapman allegedly remarked, "You better shape up, Corinne, or you're going to get it." *Id.* at 271.; *see also* Third Am. Compl. ¶ 25.

On the platform, plaintiff approached one of her supervisors to tell him about Chapman's inappropriate conduct. Because he was otherwise engaged in work, however, she informed him that she would discuss the matter with him later. *See id.* at 271–72. Plaintiff then proceeded to the women's locker room in tears, where she told several co-workers of the assault. *See* Dorien Dep. at 10–15; Mahony Dep. at 8–11, 52–53; Wahlstrom Dep. at 280.–81. One of her co-workers, Annmarie Mahony, telephoned Metro–North's Manager of Workforce Diversity, Maryann Gormley–O'Connor, and asked her to come to the locker room. *See* Gormley–O'Connor Dep. at 108; Mahony Dep. at 8, 12. Upon arriving, Gormley–O'Connor helped calm plaintiff down and took her back to her office. *See* Gormley–O'Connor Dep. at 108–09; Mahony Dep. at 10–11. Plaintiff explained what had happened and asked to speak with an Employee Assistance Program counselor. *See* Wahlstrom Dep. at

---

1. Chapman, however, as engineer, had neither control nor supervisory authority over plaintiff. *See* Chapman Dep. at 449–50; Metro–North Statement Pursuant to Loc. R. 56.1, at ¶ 9.

2. Chapman's exact words are disputed. Chapman claims he stated, "Come on, bitch, move or something," Chapman Dep. at 297, or "straighten up bitch, let's go," *id.* at 24, while Nicotra recalls him saying, "straighten yourself out, bitch," Nicotra Dep. at 19, 24. The Court, however, must take plaintiff's account as accurate for the purpose of this motion. *See Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 61 (2d Cir.1998).

213–14, 289–92. Yet, she declined to file a formal internal discrimination complaint against Chapman. *See id.* at 292–93; Koenigsberg Decl., Exh. A ("Report"), at 2.

After meeting with plaintiff, Ms. Gormley–O'Connor interviewed Chapman and Nicotra[3] later that day and on April 23, and notified Metro–North management of the incident. *See* Chapman Dep. at 63, 130; Gormley–O'Connor Dep. at 106–07; Nicotra Dep. at 15; Report at 2. During her interview with Chapman, she gave him a copy of Metro–North's sexual harassment policy and directed him to stay away from and not retaliate against plaintiff and to comply with the policy in the future. *See* Chapman Dep. at 158; Gormley–O'Connor Dep. at 85, 186; Report at 5. Thereafter, she recommended that a formal investigation be brought against Chapman, *see* Gormley–O'Connor Dep. at 190; Report at 6, and suggested that Chapman and plaintiff be separated until the conclusion of the investigation, *see* Gormley–O'Connor Dep. at 95. On April 26, 1996, Chapman was charged with conduct unbecoming a Metro–North employee and violation of Metro–North's sexual harassment policy. *See* Koenigsberg Decl., Exh. G. After numerous postponements,[4] a formal hearing was held on May 30, 1996, during which plaintiff, Chapman, Nicotra, and Mr. Joseph R. Pasanello, plaintiff's immediate supervisor, testified. *See id.,* Exh. E.

Plaintiff maintains that this was not the first time she had been harassed by Chapman. In the first alleged incident, which she admits she never reported, plaintiff claims that Chapman put his arms around her. *See* Wahlstrom Dep. at 31–32, 291–92. The second time, Chapman allegedly touched her leg, although plaintiff does not recall when the incident took place, nor did she report it. *See id.* at 36–39. Neither episode, plaintiff concedes, involved inappropriate language or sexual innuendo. *See id.* at 31, 36.

On June 6, 1996, Chapman was informed that he would be suspended without pay for forty-five days, beginning June 25, 1996, and would be required to attend Metro–North's June 19, 1996 sexual harassment workshop. *See* Chapman Dep. at 64, 196; Koenigsberg Decl., Exh. Q; *id.* Exh. S., at 28. His suspension was later upheld by Lead Trainmaster J.W. Swanberg, *see* Koenigsberg Decl., Exh. U, and the Special Board of Adjustment, *see id.* Exh. V. Plaintiff was formally notified of the outcome of these proceedings on July 19, 1996. *See id.,* Exh. R.

While Metro–North's disciplinary process was ongoing, on May 21, 1996, plaintiff filed criminal charges against Chapman. *See id.,* Exh. K; Wahlstrom Dep. at 451–53; *see also* Koenigsberg Decl., Exh. M. Thirty days later, she received a Temporary Order of Protection, forbidding Chapman from further harassing, intimidating, or threatening her. *See id.,* Exh. L; Wahlstrom Dep. at 327–28. On December 16, 1996, a North Castle Town Justice found Chapman guilty on the charge of third degree sexual abuse—a class A misdemeanor under N.Y. Penal Law § 130.55—and ordered him to pay a $1,000 fine and a $90 surcharge. *See id.,* Exh. O, at 3; *see also id.,* Exh. N.[5]

---

**3.** On the afternoon of April 22, Nicotra denied witnessing the incident. The next day, however, after speaking to the general chairman of his union, Nicotra more or less corroborated plaintiff's account. *See* Gormley–O'Connor Dep. at 107; Nicotra Dep. at 14; Report at 5.

**4.** The hearing had originally been scheduled for May 2, 1996, *see* Koenigsberg Decl., Exh. G, but was postponed on April 30, 1996, *see id.,* Exh. H. On May 8, 1996, the hearing was rescheduled for May 15, 1996. *See id.,* Exh.

I. Again, however, on May 16, 1996, the hearing was rescheduled, this time for May 30, 1996, *see id.,* Exh. J.

**5.** On April 14, 1998, Chapman's conviction was reversed on procedural grounds. The Appellate Division found the trial judge's failure to render a decision for 84 days to be, as a matter of law, an unreasonable delay. *See People v. Chapman,* 177 Misc.2d 551, 679 N.Y.S.2d 496, 496 (1998) (citing *People v. South,* 41 N.Y.2d 451, 455, 393 N.Y.S.2d 695, 697, 362 N.E.2d 246, 249 (1977)).

Following the end of his suspension and a routine physical exam, Chapman returned to service with Metro–North on August 19, 1996. *See id.*, Exh. F. Since the April 22, 1996 incident, plaintiff has not been sexually harassed or subjected to inappropriate behavior or language from Chapman. *See* Wahlstrom Dep. at 30, 248. Nor has Chapman been the subject of any sexual harassment complaints or, for that matter, any other disciplinary action. *See* Chapman Dep. at 64, 279; Sinigiani Dep. at 49. Plaintiff avers that because she continued to be fearful and anxious, she endeavored to avoid Chapman at all costs. She learned, however, that Metro–North would not transfer Chapman and that, if she wanted to avoid working with him, she would have to rearrange her schedule. *See id.* at 114–15, 239–42. She therefore claims to have declined more financially rewarding assignments and added one hundred miles to her daily commute in order to avoid him. *See id.* at 114, 171, 487. As such, plaintiff has neither worked with nor spoken to Chapman since the incident. *See id.* at 244, 372.

On May 14, 1996, plaintiff filed the instant action against Metro–North, alleging claims under FELA. *See* Compl.[6] Subsequently, the parties agreed to allow plaintiff to file a Second Amended Complaint, which added state common law claims against Chapman. *See* Stipulation, dated Feb. 6, 1997; Second Am. Compl. ¶¶ 33–40. Plaintiff also timely filed written charges of discrimination with the Equal Employment Opportunity Commission, *see* Third Am. Compl. ¶ 11, and, on March 27, 1997, received a Notice of Right to Sue, *see id.* ¶ 12. Thereafter, the parties again stipulated to permit plaintiff to further amend her Complaint, this time adding Title VII, NYSHRL, and NYCHRL claims against Metro–North. *See* Stipulation, dated June 4, 1997; Third Am. Compl. ¶¶ 43–45. Finally, on August 15, 1997, Metro–North filed a cross-claim against Chapman seeking indemnification. *See* Notice of Cross Claim, dated Aug. 15, 1997. Following discovery conducted under the supervision of the Honorable Leonard Bernikow, United States Magistrate Judge, both defendants moved for summary judgment.[7]

## DISCUSSION

### I. Standard for Summary Judgment

A moving party is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Holt v. KMI–Continental, Inc.*, 95 F.3d 123, 128 (2d Cir.1996). The moving party bears the burden of demonstrating that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Gallo v. Prudential Residential Servs. L.P.*, 22 F.3d 1219, 1223–24 (2d Cir.1994). "In moving for summary judgment against a

---

**6.** On May 15, 1996, plaintiff filed a First Amended Complaint, which provided paragraph enumeration that had originally been omitted. *See* First Am. Compl. ¶¶ 21–23.

**7.** This Court has previously issued three *Memorandum Orders* in this case. On November 25, 1996, the Court denied Metro–North's motion, pursuant to Fed.R.Civ.P. 12(f), to strike allegations it claimed were immaterial, impertinent, and scandalous. *See Wahlstrom v. Metro–North Commuter R.R. Co.*, 1996 WL 684211, at *2–*3 (S.D.N.Y. Nov. 25, 1996). In the second decision, on March 5, 1998, the Court affirmed an Order from Judge Bernikow, granting plaintiff's request for disclosure of internal documents, such as disciplinary records, held by Metro–North regarding Chapman's 1989 arrest and prosecution. *See Wahlstrom*, 1998 WL 99799, at *1–*2 (S.D.N.Y. Mar. 5, 1998). Finally, on April 23, 1998, the Court denied Chapman's request for an Order compelling Metro–North to pay the costs of his legal defense. *See Wahlstrom*, 1998 WL 196236, at *2–*3 (S.D.N.Y. Apr. 23, 1998).

party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995).

In deciding a motion for summary judgment, the Court's function is not to try issues of fact, but instead to determine whether there remain any such issues to try. *See Sutera v. Schering Corp.*, 73 F.3d 13, 15–16 (2d Cir.1995). In doing so, the Court must resolve all ambiguities and draw all justifiable inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Holt*, 95 F.3d at 129. However, the substantive law governing the case will identify those facts that are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

"A 'genuine' dispute over a material fact only arises if the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *Dister v. Continental Group*, 859 F.2d 1108, 1112 (2d Cir.1988) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). Thus, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Mere speculation or conjecture" will not suffice, *see Western World Ins. Co. v. Stack Oil Inc.*, 922 F.2d 118, 121 (2d Cir. 1990), nor will "reliance on unsupported assertions," *Goenaga*, 51 F.3d at 18. Rather, the nonmoving party must provide "concrete evidence from which a reasonable juror could return a verdict in [her] favor." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505.

## II. Plaintiff's FELA Claims

Under FELA, a railroad engaged in interstate commerce is liable to "any person suffering injury while [s]he is employed by [the railroad] ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of [the railroad]." 45 U.S.C. § 51. The Act requires covered employers "to provide its employees with a reasonably safe place to work." *Sinclair v. Long Island R.R.*, 985 F.2d 74, 76 (2d Cir.1993). As a remedial statute, a cause of action under FELA is "broader than those available under principles of common-law negligence." *Goldwater v. Metro–North Commuter R.R.*, 101 F.3d 296, 298 (2d Cir.1996). Toward this end, the federal courts have "liberally construed" FELA to allow employee recovery. *Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 543, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994).

Based on these principles, the Second Circuit has placed a particularly heavy burden on parties seeking summary judgment on FELA claims. As the Court of Appeals stated in *Gadsden v. Port Auth. Trans–Hudson Corp.*, 140 F.3d 207, 209 (2d Cir.1998), "[u]nder the FELA, 'the case must not be dismissed at the summary judgment phase unless there is absolutely no reasonable basis for a jury to find for the plaintiff.'" (quoting *Syverson v. Consolidated Rail Corp.*, 19 F.3d 824, 828 (2d Cir.1994)). Indeed, this Court recently noted that "[w]ith respect to the traditional common-law negligence elements embodied in FELA, ... the proof requirements under FELA are substantially relaxed as compared with common-law negligence claims, so as to promote submission of FELA claims to a jury for decision." *Kelly v. Metro–North Commuter R.R.*, 37 F.Supp.2d 233, 237 (S.D.N.Y. 1999) (Leisure, J.); *see also Eggert v. Norfolk & W. R.R. Co.*, 538 F.2d 509, 511 (2d Cir.1976) ("[T]he role of the jury is significantly greater in FELA cases than in common law negligence actions"). Notwith-

standing these considerations, to survive summary judgment, a plaintiff " 'must at least offer some evidence that would support a finding of negligence.' " *Sinclair*, 985 F.2d at 77 (quoting *O'Hara v. Long Island R.R.*, 665 F.2d 8, 9 (2d Cir.1981) (per curiam)).

## A. Metro–North's Knowledge of Chapman's Propensities

■ Plaintiff pleads claims of negligent retention and supervision of an employee, *see* Third Am. Compl. ¶¶ 40–41, as well as negligent infliction of emotional distress, *see id.* ¶ 42. To succeed on these negligence claims, plaintiff must demonstrate that Metro–North "knew or should have known prior to the assault of propensities of the assailant to commit such assaults." *Harrison v. Missouri Pac. R.R. Co.*, 372 U.S. 248, 249, 83 S.Ct. 690, 9 L.Ed.2d 711 (1963); *see also Green v. River Terminal Ry. Co.*, 763 F.2d 805, 808–09 (6th Cir. 1985) ("A railroad has no liability for an assault by one employee upon another in the absence of notice of the assaulter's 'vicious propensities'. . . ."); *Besta v. Consolidated Rail Corp.*, 580 F.Supp. 869, 870 (S.D.N.Y.1984). Plaintiff's burden is thus two-fold: She must show both that (1) Chapman had a propensity for "the type of behavior that caused plaintiff's harm," and (2) Metro–North knew of this propensity. *Ross v. Mitsui Fudosan, Inc.*, 2 F.Supp.2d 522, 532 (S.D.N.Y.1998) (Leisure, J.).

■ Plaintiff submits that Chapman's propensity for such assaults is evidenced by his March 2, 1989 arrest, after which he was charged with two counts of sexual abuse of a minor and one count of endangering the welfare of a minor. *See* Koenigsberg Decl. Filed Under Seal ("Sealed Decl."), Exh. B. The purported victims, aged 13 and 14, accused Chapman of sexually assaulting them while on board Metro–North trains. *See id.*, Exh. C. Metro–North immediately suspended Chapman. *See id.*, Exh. D. A formal investigation was scheduled for March 14, 1989, but was postponed at the request of Chapman's

union, to be rescheduled following the completion of the criminal proceedings. *See id.*, Exh. F; Bova Dep. at 19; Chapman Dep. at 259.

However, on July 27, 1989, after deliberating for a mere ten minutes, the jury found Chapman not guilty. *See* Chapman Dep. at 259, 320. Two weeks later, Chapman's attorney informed the union that his client had been found not guilty on all charges. *See* Sealed Decl., Exh. G. He also telephoned Richard Sinigiani, the highest ranking manager in Metro–North's Transportation Department, and advised Sinigiani's administrative assistant that Chapman's accusers had been involved in a "similar situation in another town" and explained that the charges against Chapman were the result of an incident in which the two boys "said they'd get even with him" after he intervened in their attempt to "push an older woman off the train." *Id.*, Exh. H; *see also* Chapman Dep. at 248–49, 321–22. After receiving this information, Sinigiani canceled the formal investigation. *See* Sealed Decl., Exh. I; Bova Dep. at 25–26; Sinigiani Dep. at 29–35. On August 23, 1989, Chapman was cleared to return to service, following completion of a standard work physical. *See* Sealed Decl., Exhs. J.–K; Chapman Dep. at 60–63.

The fact that Chapman was arrested and tried on charges of sexual abuse raises a substantial issue of material fact as to whether Chapman had a propensity to commit similar assaults onboard Metro–North trains. Although plaintiff provided no evidence that these alleged assaults did in fact occur, because the Court is required to draw all inferences in plaintiff's favor, and in light of the presumption in favor of reserving FELA issues for the jury, the Court cannot say, as a matter of law, that Chapman had no propensity for misbehavior.

Furthermore, notwithstanding Metro–North's denial of having had "actual knowledge" that Chapman had done anything wrong prior to April 22, 1996, *see*

Metro–North Mem. at 21, this issue too is properly within the province of the jury. Unlike *Persley v. National R.R. Passenger Corp.,* 831 F.Supp. 464, 468 (D.Md.1993), where the court found no evidence indicating that an employee alleged to have sexually harassed the plaintiff "had ever committed any act even arguably similar to a sexual or other assault" prior to the date of the incident, it is undisputed that the highest managers in Metro–North's Labor and Transportation Departments were informed of Chapman's arrest, yet dropped the investigation upon his acquittal.[8] It may be true that Metro–North did not know for sure whether such molestation actually occurred. Nevertheless, once a reasonable suspicion has been raised, an employer cannot avoid liability by shielding its eyes to the facts. Although Metro–North has proffered a rational explanation for its decision—that the charges appeared to be a "cruel joke" in retaliation for Chapman's vigilance—it is for the jury to decide whether it was reasonable for it not to pursue the matter further. Thus, the Court cannot say that the alleged assault was not reasonable foreseeable.

**B. Nature of Plaintiff's Injuries**

■ Metro–North's second contention is that under *Consolidated Rail Corp. v. Gottshall,* 512 U.S. 532, 555–57, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994), plaintiff's purely emotional injuries are not cognizable under FELA. *See* Metro–North Mem. at 22–24. Although there is no legislative history suggesting that Congress had any thought of providing a remedy for sexual

harassment in enacting FELA, *see Griggs v. National R.R. Passenger Corp.,* 900 F.2d 74, 76 (6th Cir.1990), the Supreme Court has recognized that "the general congressional intent was to provide liberal recovery for injured workers, and ... Congress intended the creation of no static remedy, but one which would be developed and enlarged to meet changing conditions and changing concepts of industry's duty toward its workers." *Kernan v. American Dredging Co.,* 355 U.S. 426, 432, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958). Still, FELA does not subject employers to liability "to cover the stresses and strains of everyday employment," for the Act was not meant "to make railroads the insurers of the emotional well-being and mental health of their employees." *Gottshall,* 512 U.S. at 554, 114 S.Ct. 2396.

■ In *Gottshall,* the Supreme Court held that while FELA does cover emotional injuries, *see id.* at 550, 114 S.Ct. 2396, an employee may only recover for "injuries—physical and emotional—caused by the negligent conduct of their employers that *threatens them imminently with physical impact,"id.* at 556, 114 S.Ct. 2396 (emphasis added). This standard represents the traditional common law "zone of danger" test. *See id.* at 554–55, 114 S.Ct. 2396. Accordingly, courts have consistently dismissed FELA claims where the plaintiff fails to allege that the harassment to which he or she was subjected included at least some sort of physical contact or threat of imminent physical harm.[9]

■ Furthermore, the Supreme Court has since elaborated that the term "physi-

---

**8.** *Cf. Tomka v. Seiler Corp.,* 66 F.3d 1295, 1318 (2d Cir.1995) ("Although [plaintiff] claims that [her assailant] had previously raped and sexually harassed another female ... employee, [plaintiff] has produced no evidence of prior assaults or sexual misconduct by [her assailant]."); *Gallo v. Dugan,* 228 A.D.2d 376, 645 N.Y.S.2d 7, 8 (1st Dep't 1996) (setting aside jury verdict where plaintiff "failed to prove, by a preponderance of the evidence, that the employee had a history of, or propensity for, assaultive behavior and that even if such was proven, that plaintiff knew or should have known of such propensity"); *Kirkman v. Astoria Gen. Hosp.,* 204

A.D.2d 401, 611 N.Y.S.2d 615, 616 (2d Dep't 1994) (finding no liability where neither the defendant nor its independent contractor had any "knowledge of the employee's propensity for the sort of behavior which caused the injured party's harm").

**9.** *See, e.g., Martinez v. Bally's Casino Lakeshore Resort,* No. CIV A 98–0828, 2000 WL 23099, at *2 (E.D.La. Jan. 12, 2000); *Perna v. Arco Marine, Inc.,* No. CIV. A. 97–4326, 1999 WL 1081074, at 5–*6 (E.D.Pa. Nov. 30, 1999); *Decesare v. National R.R. Passenger Corp.,* No. Civ. A. 99–129, 1999 WL 972009, at *4–*5 (E.D.Pa. Oct. 25, 1999); *Wiora v. Harrah's Ill.*

cal impact" does "not encompass every form of physical contact." *Metro–North Commuter R.R. Co. v. Buckley*, 521 U.S. 424, 432, 117 S.Ct. 2113, 138 L.Ed.2d 560 (1997). Rather, it has implied that the term applies only to contact that causes "immediate traumatic harm." *Id.* at 430, 117 S.Ct. 2113. Thus, a mere uninvited touching does not automatically raise a jury question on the issue of whether plaintiff suffered a "physical impact." See, e.g., *Allen v. National R.R. Passenger Corp.*, 90 F.Supp.2d 603, 613 (E.D.Pa.2000) (granting summary judgment, concluding that plaintiff's accusations that her foreman briefly touched her ear and hand "alleged merely harmless touching ... that neither caused physical injury nor could have resulted in physical harm"); *Visconti v. Consolidated Rail Corp.*, 801 F.Supp. 1200, 1204, 1212–13 (S.D.N.Y. 1992) (dismissing plaintiff's FELA claims where plaintiff alleged that her supervisor " 'brush[ed] close' to her body, stood close to her for one or two minutes and put his hand on her back for less than a minute," yet she did not report the incident for

months). Rather, the incident must "rise to the level of [a] physical harm that is protected under FELA," *Dziegelewski*, 1995 WL 63155, at \*3, that is, one "consistent with FELA's central focus on physical perils," *Gotshall*, 512 U.S. at 556, 114 S.Ct. 2396; *see also id.* (suggesting that the employer becomes liable based on the "emotional injury caused by the apprehension of physical impact," regardless of whether actual physical contact occurs).

 Since *Gottshall*, numerous courts have considered FELA claims alleging sexual harassment of one form or another. Having canvassed their decisions, it is apparent that in such cases, the viability of the plaintiff's cause of action depends entirely on whether the actual or threatened "physical impact" placed the plaintiff in reasonable apprehension of physical harm. *See, e.g., Dennis v. Consolidated Rail Corp.*, No. CIV. A. 93–1915, 1994 WL 494453, at \*9 (E.D.Pa. Sept. 7, 1994) (denying summary judgment where plaintiff complained that her supervisor "grabbed and squeezed her buttocks two or three times," concluding that "[t]hat assault clearly entails a physical impact").[10]

*Corp.*, 68 F.Supp.2d 988, 995, 996–97 (N.D.Ill.1999) (Jones Act claim); *Dziegelewski v. Consolidated Rail Corp.*, No. 93 Civ. 2666, 1995 WL 63155, at \*3 (S.D.N.Y. Feb. 15, 1995); *Crooks v. Metro–North Commuter R.R. Co.*, No. 93 Civ. 6030, 1994 WL 719683, at \*2–\*3 (S.D.N.Y. Dec. 28, 1994); *Barlette v. Consolidated Rail Corp.*, No. 92–CV–251S, 1994 WL 721342, at \*3 (W.D.N.Y. Dec. 6, 1994); *McGinnis v. Norfolk & W. Ry. Co.*, No. 93 CV 71763, 1995 WL 356356, at \*5–\*6 (E.D.Mich. Sept. 23, 1994); *Gallagher v. Metro North Commuter R.R. Co.*, 846 F.Supp. 291, 293 (S.D.N.Y.1994); *Basile v. Amtrak*, No. CV–91–3291, 1993 WL 416637, at \*10 (E.D.N.Y. Sept. 22, 1993); *Milam v. Herrlin*, 819 F.Supp. 295, 303 n. 6 (S.D.N.Y.1993); *Cohen v. Metro–North Commuter R.R. Co.*, No. 89 Civ. 7498, 1991 WL 4699, at \*3 (S.D.N.Y. Jan. 11, 1991); *see also Griggs*, 900 F.2d at 75 (finding that plaintiff's sexual harassment claim was not cognizable under FELA because the discrimination alleged by plaintiff "was not a tort at common law").

**10.** *See also Wilson v. Zapata Off–Shore Co.*, 939 F.2d 260, 265–66 (5th Cir.1991) (finding

that assertions that male co-workers subjected female plaintiff to unwanted physical contact, occasionally amounting to common law battery, were sufficient to state a claim under the Jones Act, which incorporates FELA by reference); *Frazier v. Callais & Sons, Inc.*, No. Civ. A. 99–791, 1999 WL 717666, at \*3–\*4 (E.D.La. Sept. 13, 1999) (denying motion to dismiss where plaintiff alleged racial discrimination based on physical threats that caused him to "fear[] that his life or person was threatened with imminent harm") *Cash v. Tidewater Marine, Inc.*, 34 F.Supp.2d 448, 450 (S.D.Tex.1999) (denying summary judgment on Jones Act claim where plaintiff alleged numerous instances of sexual assault); *Martin v. Norfolk S. Ry. Co.*, 926 F.Supp. 1044, 1050–51 (N.D.Ala.1996) (refusing to dismiss claims where plaintiff alleged that co-workers repeatedly grabbed and pinched him, tried to put him in a headlock, and attempted to stick a broom handle into his anus); *Masiello v. Metro–North Commuter R.R.*, 748 F.Supp. 199, 205 (S.D.N.Y.1990) (denying summary judgment where plaintiff "alleged that her injuries were caused at least in part by physical contact," having recounted incidents of

This murky standard, which requires a case-by-case analysis of the circumstances surrounding each complaint, is consistent with the Supreme Court's prior admonition that "whether one can recover for emotional injury might rest on a variety of subtle and intricate distinctions related to the nature of the injury and the character of the tortious activity." *Atchison, Topeka & Santa Fe Ry. Co. v. Buell,* 480 U.S. 557, 568, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987).

Here there is no doubt that a jury could reasonably find, based on plaintiff's allegations, that she sustained a "physical impact," *i.e.,* that a reasonable person in her position would have suffered apprehension of physical harm. The alleged incident involved far more than a verbal assault and cannot be characterized as a mere "uninvited touching." Plaintiff was accosted from behind by a six-foot, 275–pound man, *see* Chapman Dep. at 7, whom she hardly knew, *see* Wahlstrom Dep. at 50–52, and was slapped on the buttocks so hard that it stung, *see id.* at 252–53, 275. In fact, Chapman himself concedes that plaintiff's battery claim should be submitted to a jury since "[a] factual dispute exists as to whether or not [he] touched the plaintiff." Chapman Mem. at 4; *cf. Martinez,* 2000 WL 23099, at *2 (stating that the Jones Act, which incorporates FELA by reference, "permits claims for sexual harassment that amount to claims for battery"). From plaintiff's perspective, it would be reasonable to assume that she feared her assailant was about to cause her physical harm, particularly in light of the sexual nature of his attack.[11]

Metro–North cites two cases in which the plaintiff experienced physical contact but was deemed not to have suffered the requisite "physical impact" to trigger FELA liability. Both, however, are distinguishable from the instant action. In the first case, *Tongret v. Norfolk & W. Ry. Co.,* 980 F.Supp. 903, 904–05 (N.D.Ohio 1997), the male plaintiff alleged that his male supervisor "hit [him] in the back of the neck, put him in a headlock, and breathed in his face." Although the plaintiff's head moved forward, his hat did not fall off and he remained standing. *See id.* at 905. He claimed to suffer a headache, but had no bump on his head. *See id.* The court found that "the headlock was nothing more than an uninvited touching, not an infliction of injury," and concluded that "[b]ecause FELA is concerned with threats to physical safety and security, mere unwanted touching cannot constitute the requisite physical impact." *Id.* at 907.

Similarly, in *McMillan v. National R.R. Passenger Corp.,* 648 A.2d 428, 430–31 (D.C.1994), the District of Columbia Court of Appeals dismissed a FELA claim brought by a male plaintiff who alleged that he had been the victim of harassment perpetuated by his male supervisors and co-workers, including a punch in the left shoulder and an incident in which a co-worker lit a blow torch and placed it near the seat of his welding pants.[12] Because the plaintiff "offered no evidence that his physical safety was imminently endangered by his co-workers' alleged harassment and horseplay," the court ruled that he had "failed to demonstrate that the threat of injury claimed was more than minimal or negligible." *Id.* at 434. Thus, it held, "[t]hough [plaintiff's] experiences

being "uninvitingly kissed, hugged, grabbed, and physically lifted off the ground"); *Vance v. Consolidated Rail Corp.,* 73 Ohio St.3d 222, 652 N.E.2d 776, 783 (1995) (finding that incidents of abuse, including episodes in which co-workers threatened plaintiff with a chipping hammer and nearly ran him over with a truck to "put a scare" into him, demonstrated plaintiff's fear for his physical safety).

**11.** *See* Lucy Berliner, *Sex Offenders: Policy and Practice,* 92 Nw. U.L.Rev. 1203, 1206

(1998) ("Sexual assault is associated with greater psychological harm than other crimes."); David P. Valentiner *et al., Coping Strategies and Posttraumatic Stress Disorder in female Victims of Sexual and Nonsexual Assault,* J. Abnormal Psychol. 455, 456–57 (1996) (concluding that sexual assault victims suffer more severe post-trauma symptoms than do non-sexual assault victims).

**12.** Neither plaintiff nor his pants sustained burns. *See McMillan,* 648 A.2d at 430.

may be characterized as both annoying and frustrating, his assertions, as a matter of law, do not constitute being in a zone of physical danger." *Id.*[13]

The obvious distinction between these decisions and the instant action is that neither of the two plaintiffs alleged an assault of a sexual nature. Rather, both cases involved harassment of a male employee by one or more male supervisors or co-workers. Neither plaintiff was half the size of his assailant, nor did any of the incidents appear sexually-charged. There is nothing to suggest that the physical contacts at issue in these cases were anything more than typical male horseplay. Thus, because the facts in *Tongret* and *McMillan* bear little resemblance to the allegations here, their logic is unpersuasive.

Accordingly, questions of fact exist as to whether plaintiff did indeed "sustain a physical impact as a result of defendant's negligent conduct," *Gottshall*, 512 U.S. at 547–48, 114 S.Ct. 2396, as the parties dispute whether the attack alleged by plaintiff actually took place. *Compare* Wahlstrom Dep. at 252–54 (describing her account of the incident), *with* Chapman Dep. at 21–23 (stating that he does not recall touching plaintiff at all). It is up to the jury to determine what happened that day, as well as whether Metro–North could have reasonably foreseen such an assault. Summary judgment is therefore inappropriate with respect to plaintiff's FELA claims.[14]

## II. Plaintiff's Title VII Claim

Title VII prohibits employers from discriminating against any individual with respect to the "compensation, terms, conditions, or privileges of employment, because of such individual's ... sex" 42 U.S.C. § 2000e–2(a)(1). Plaintiff seeks relief for alleged sexual harassment based on a "hostile work environment" theory, "which requires her to establish (1) that the 'workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [her] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer.'" *Richardson v. New York State Dep't of Correctional Service*, 180 F.3d 426, 436 (2d Cir.1999) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997)).

Although the Second Circuit has admonished district courts not to grant summary judgment where questions persist as to whether the conduct at issue amounts to sexual harassment, *see Gallagher v. Delaney*, 139 F.3d 338, 343–44 (2d Cir.1998), such disposition "is still fully appropriate, indeed mandated, when the evidence is insufficient to support the non-moving party's case." *Distasio*, 157 F.3d at 62. Rule 56 must be used "'sparingly' when, as is often the case in sexual harassment claims, state of mind or intent are at issue." *Id.* at 61 (quoting *Dister*, 859 F.2d at 1114). Nevertheless, "the salutary purposes of

---

13. Metro–North's reliance on *McMillan* is also misplaced in that, although the D.C. Court of Appeals affirmed the trial court's dismissal of the plaintiff's cause of action for negligent infliction of emotional distress, *see McMillan*, 648 A.2d at 432–35, it reversed its directed verdict on plaintiff's direct negligence theory. Not unlike the allegations in the instant action, Mr. McMillan argued that his employer knew or should have known that his co-worker "was a person with a propensity for violence." *Id.* at 435. On this claim, the court concluded that "reasonable jurors could differ as to whether or not Amtrak agents acted as reasonable and prudent men would ordinarily have acted under the circumstances of the situation." *Id.* at 436.

14. Because the Court finds that plaintiff's emotional injuries are cognizable under FELA, it need not consider whether the headaches and spasm she suffered qualify as "physical injuries" under the Act. It also need not decide whether plaintiff's allegations describe a "severe emotional injury," *Buell*, 480 U.S. at 566 n. 13, 107 S.Ct. 1410, as the Second Circuit has explained that it "do[es] not read *Buell* as necessarily mandating that the court determine whether the nature and extent of the plaintiff's injury is 'severe.'" *Puthe v. Exxon Shipping Co.*, 2 F.3d 480, 483 (2d Cir.1993).

summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985).

## A. Hostile Work Environment

■ To establish the existence of a hostile work environment, plaintiff must show that "[her] workplace [was] permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [her] employment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citations omitted). In determining whether the atmosphere is sufficiently hostile, the Court must consider the totality of circumstances. *See Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 319 (2d Cir.1999). Factors to weight include: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a 'mere offensive utterance;' (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted." *Richardson,* 180 F.3d at 437 (citing *Harris,* 510 U.S. at 23, 114 S.Ct. 367).

■ Generally speaking, "isolated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." *Tomka,* 66 F.3d at 1305 n. 5; *see also Carrero v. New York City Hous. Auth.,* 890 F.2d 569, 577–78 (2d Cir.1989) ("The incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive."). Yet, if the alleged conduct is "extraordinarily severe," a single incident of sexual assault may create a hostile environment. *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir.2000); *see also Tomka,* 66 F.3d at 1305 ("[E]ven a single incident of sexual assault sufficiently alters the conditions of the victim's employment

and clearly creates an abusive work environment...."). To be actionable, the alleged conduct must be both objectively and subjectively offensive, such that a reasonable person would find the behavior hostile or abusive, and such that the plaintiff herself did, in fact, perceive it to be so. *See Harris,* 510 U.S. at 21–22, 114 S.Ct. 367.

Having testified that she felt frightened and nervous, plaintiff clearly satisfies the subjective component of establishing a hostile work environment. She must still, however, demonstrate that a reasonable person would find Chapman's conduct hostile and abusive. *See Harris,* 510 U.S. at 21–22, 114 S.Ct. 367. As the District Court noted in *Ponticelli v. Zurich Am. Ins. Group,* 16 F.Supp.2d 414, 429 (S.D.N.Y.1998), "[e]valuating the severity and pervasiveness of a harasser's conduct on summary judgment is neither easy nor, in many cases, appropriate." Accordingly, the question of whether particular acts create a hostile work environment is usually best left to the trier of fact. *See Sowemimo v. D.A.O.R. Sec., Inc.,* 43 F.Supp.2d 477, 484 (S.D.N.Y.1999); *Ponticelli,* 16 F.Supp.2d at 431; *see also Gallagher,* 139 F.3d at 347 ("Evaluation of ambiguous acts ... presents an issue for the jury.").

■ Metro–North argues that isolated incidents of improper touching cannot constitute "abuse of sufficient severity or pervasiveness as to 'alter the conditions of [her] employment with regard to frequency or regularity.'" *Quinn,* 159 F.3d at 768 (quoting *Harris,* 510 U.S. at 21, 114 S.Ct. 367). For example, in *Quinn,* the Second Circuit held that allegations that co-worker commented that the plaintiff had been voted the "sleekest ass" in the office and, on a separate occasion, "deliberately touched [the plaintiff's] breasts with some papers that he was holding in his hand," did not suffice to create a hostile work environment because, while "obviously offensive and inappropriate," the incidents were "sufficiently isolated and discrete that a trier of fact could not reasonably conclude that they pervaded [the plaintiff's] work environment." *Id.* at 768.

Considering this evidence in the light most favorable to plaintiff, *see Cruz,* 202 F.3d at 571, the Court finds that based on the severity of the alleged incident, plaintiff has met her objective burden of demonstrating an atmosphere of sexual hostility. Unlike the decisions cited by Metro–North, the physical contact between the parties was neither harmless nor accidental. Those cases, in which the plaintiff was either briefly touched or brushed up against,[15] are clearly distinguishable from the instant action. It cannot be disputed that the actions alleged to have occurred here were violent, intentional, and physically harmful. *See* Wahlstrom Dep. at 275 ("Q: Did he slap it lightly [or] hard? A: He slapped it hard. Q: Was it painful? A: It stung, yes.").

To be sure, plaintiff's allegations do not rise to the severity of the incident in *Tomka,* 66 F.3d at 1305, in which the plaintiff was raped by multiple co-workers. Yet, such " 'appalling conduct' " certainly does not " 'mark the boundary of what is action-able,' " else employers would be immune from liability "in all but the most egregious of cases." *Torres v. Pisano,* 116 F.3d 625, 631 (2d Cir.1997) (quoting *Harris,* 510 U.S. at 22, 114 S.Ct. 367). Chapman is alleged to have sexually assaulted plaintiff as part of a "physically threatening and humiliating" episode. *Harris,* 510 U.S. at 23, 114 S.Ct. 367; *see also Cruz,* 202 F.3d at 571 ("[T]he physically threatening nature of [plaintiff's supervisor's] behavior, which repeatedly ended with him backing [plaintiff] into the wall until she had to 'cut the conversation short' in order to extricate herself, brings this case over the line separating merely offensive or boorish conduct from actionable sexual harassment."); *Watts v. New York City Police Dep't,* 724 F.Supp. 99, 105 (S.D.N.Y.1989) ("[C]onduct less pervasive, but more offensive in form and effect, than slurs and epithets can so poison a working environment as to render it abusive. Physical assaults of a sexual nature obviously constitute incidents that tend to satisfy this criterion of severity.");[16] *cf. Brennan,* 192 F.3d at 319

---

**15.** *See, e.g., Quinn,* 159 F.3d at 763–64 (finding insufficient evidence of hostile work environment where a co-employee "brush[ed] against [the plaintiff's] breasts with papers he was carrying"); *Salvatore v. KLM Royal Dutch Airlines,* No. 98 Civ. 2450, 1999 WL 796172, at *11 (S.D.N.Y. Sept. 30, 1999) (holding that allegations that plaintiff's supervisor "brushed up against her on 'some occasions' " were not actionable); *Gregg v. New York State Dep't of Taxation & Finance,* No. 97 Civ. 1408, 1999 WL 225534, at *3*12 (S.D.N.Y. Apr. 19, 1999)(granting summary judgment where plaintiff alleged four "minor" instances of offensive touching, including a "pat[ ] on the behind"); *Francis v. Chemical Banking Corp.,* 62 F.Supp.2d 948, 959 (E.D.N.Y.1999) (finding no actionable conduct where plaintiff's supervisor "brushed his hand against [her] buttocks"); *Lucas v. South Nassau Communities Hosp.,* 54 F.Supp.2d 141, 147 (E.D.N.Y.1998) (dismissing hostile work environment claim where plaintiff's supervisor briefly touched her on two occasions); *Salem v. Software Guidance & Assistance, Inc.,* No. 96 Civ. 8437, 1997 WL 777402, at *3 (S.D.N.Y. Dec. 16, 1997) (granting summary judgment where plaintiff's supervisor "made sexually charged remarks, commented on the size of women's breasts, and at one point touched plaintiff's rear-

end"); *Samuels v. New York State Dep't of Correctional Services,* No. 94 Civ. 8645, 1997 WL 253209, at *7 (S.D.N.Y. May 14, 1997) (granting summary judgment where plaintiff complained of a sole incident of being poked in the breast during a fire drill); *Gonzalez v. Kahan,* No. CV 88–922, 1996 WL 705320, at *3 (E.D.N.Y. Nov. 25, 1996) (holding that plaintiff's allegation that her professor gave her a brief "bear hug" was insufficient to constitute a hostile work environment); *Lamar v. Nynex Serv. Co.,* 891 F.Supp. 184, 185 (S.D.N.Y.1995) (ruling that allegations that plaintiff's supervisor touched her hand and stared at her were "too mild and innocuous to constitute sexual harassment as a matter of law").

**16.** *See also, e.g., Distasio,* 157 F.3d at 63 (reversing grant of summary judgment where co-worker hugged plaintiff, touched her feet with his feet while they were seated together, attempt to touch her chest, and exposed himself); *Jasmin v. New York State Dep't of Labor,* No. 98 Civ. 7569, 1999 WL 1225249, at *3 (S.D.N.Y. Dec. 28, 1999) (denying summary judgment where supervisory inspector threatened plaintiff with physical injury); *Draeger v. Bronx–Lebanon Hosp. Ctr.,* No. 98 Civ. 3688, 1999 WL 562103, at *4 & n. 5 (S.D.N.Y. Aug. 2, 1999) (denying motion to dismiss where

(granting summary judgment where sexually explicit pictures and banter "could not reasonably be characterized as physically threatening or humiliating"); *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, No. 95 Civ. 0202, 1997 WL 642556, at *3 (finding no hostile work environment where the alleged incidents "did not involve physical conduct, verbal abuse or unwanted sexual advances"). The conduct in question was not only offensive, but also criminal, having resulted in a misdemeanor conviction. *See Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) ("Respondent's allegations in this case—which include not only pervasive harassment but also criminal conduct of the most serious nature—are plainly sufficient to state a claim for 'hostile environment' sexual harassment."); *Crisonino v. New York City Hous. Auth.*, 985 F.Supp. 385, 392 (S.D.N.Y.1997) (finding triable issue of fact where plaintiff's superior referred to her as a "dumb bitch" and pushed her so hard that she fell backward and sustained injuries, resulting in a charge of harassment in the second degree).

Resolving all ambiguities and drawing reasonable inferences in favor of plaintiff, a reasonable finder of fact could determine that Chapman's actions constituted "conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Thus, the Court cannot say that, as a matter of law, plaintiff was not subjected to a hostile work environment.

**B. Employer Liability**

 While plaintiff has successfully demonstrated triable issues of fact with regard to her work environment, that alone is not sufficient to survive summary judgment. She must also establish a basis, rooted in common law agency principles, on which to hold Metro–North liable for Chapman's conduct. *See Meritor*, 477 U.S. at 72, 106 S.Ct. 2399. When a co-worker, as opposed to a supervisor, is alleged to have engaged in sexual harassment, the "employer will generally not be liable unless 'the employer either provided no reasonable avenue of complaint or knew of the harassment but did nothing about it.'" *Tomka*, 66 F.3d at 1305 (quoting *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 62 (2d Cir.1992)). Once the employer has notice of a hostile work environment, however, it has a duty to take reasonable steps to eradicate it. *See Murray v. New York Univ. College of Dentistry*, 57 F.3d 243, 249 (2d Cir.1995).

**1. Reasonable Avenue of Complaint**

 "The question of whether an employer has provided a 'reasonable avenue of complaint' is a question for the jury, whose inquiry is informed by the evidence as a whole, including evidence of the motivations and actions of the employer between the time the grievance procedure is concluded and the time the employee is discharged." *Reed v. A.W. Lawrence &*

---

alleged conduct involved "unwanted groping and grabbing"); *Matute v. Hyatt Corp.*, No. 98 Civ. 1712, 1999 WL 135204, at *3 (S.D.N.Y. Mar. 11, 1999) (finding triable question of fact where plaintiff alleged that his manager touched his penis and tried to kiss him); *Funk v. F & K Supply, Inc.*, 43 F.Supp.2d 205, 216 (N.D.N.Y.1999) (refusing to grant judgment as a matter of law based on evidence of "sexually offensive contacts, threats of physical violence, episodic tirades, physical assaults," and inappropriate language); *Rashid v. Beth Israel Med. Ctr.*, No. 96 Civ. 1833, 1998 WL 689931, at *3 (S.D.N.Y.1998) (denying summary judgment where plaintiff's su-

pervisor allegedly "grabbed and squeezed her breasts, put his hand over her mouth, held her against the wall as she struggled to push him away with both hands, and touched her thigh"); *Schiraldi v. AMPCO Sys. Parking*, 9 F.Supp.2d 213, 220 (W.D.N.Y.1998) (stating that co-worker's grabbing plaintiff from behind and rubbing his penis against her buttocks while fully clothed created a hostile work environment); *Yaba v. Roosevelt*, 961 F.Supp. 611, 620 (S.D.N.Y.1997) ("[A] serious incident of sexual touching and harassment .... if credited by a jury, could be judged sufficient to have created a hostile or offensive working environment.").

*Co.*, 95 F.3d 1170, 1181 (2d Cir.1996) (quoting *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir.1987)). Nonetheless, summary judgment will be appropriate if, after drawing all inferences and resolving all ambiguities in plaintiff's favor, the Court finds plaintiff's evidence insufficient to raise an issue of material fact undermining Metro–North's explanations. *See Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 716 (2d Cir.1996).

■ "Although not necessarily dispositive, the existence of an anti-harassment policy with complaint procedures is an important consideration in determining whether the employer has [exercised reasonable care in preventing and correcting sexually harassing conduct]." *Caridad v. Metro–North Commuter R.R.*, 191 F.3d 283, 295 (2d Cir.1999). Where an employer has promulgated a sexual harassment policy and informs all employees of its contents, such procedures will generally be deemed adequate,[17] so long as employees are capable of invoking the process to enforce the policy. Still, courts have been clear that "[t]he mere existence of sexual harassment complaint procedures does not immunize defendant." *Crisonino*, 985 F.Supp. at 390; *see also Kracunas v. Iona College*, 119 F.3d 80, 89 (2d Cir.1997). Those officials responsible for investigating accusations of harassment must also respond to complaints in a serious and timely fashion. *See Kracunas*, 119 F.3d at 89; *Crisonino*, 985 F.Supp. at 390.

■ It is undisputed that at the time the alleged incident occurred, Metro–

North had in place a policy against sexual harassment. Promulgated in 1988, Metro–North's sexual harassment prevention policy defined sexual harassment and covered all Metro–North employees. *See* Dansicker Decl., Exh. N, at 1; Gormley–O'Connor Dep. at 33. The version of the policy in place as of April 22, 1996 was embodied in a January 1996 memorandum to all Metro–North employees. *See* Dansicker Decl., Exh. N. The notice states unequivocally:

> In addition to being illegal, sexual harassment is also demeaning to the victim and decreases workplace productivity. Such behavior will not be tolerated at MTA Metro–North. If it is proven that sexual harassment has occurred, the Company will take immediate action to remedy the situation and discipline the violator(s).... Disciplinary action ... may include dismissal.

*Id.* at 1. The memorandum also established procedures for employees who believe they have been victims of sexual harassment, *see id.* at 1–2, and promised that "[a]ll complaints will receive prompt attention and will be handled in a confidential manner to the extent possible," *id.* at 2.

Metro–North required its managers and supervisors to post the memorandum on their bulletin boards and explain it to their subordinates. *See* Gormley–O'Connor Dep. at 32. It also distributed copies of the policy to all employees once a year along with their paychecks.[18] *See id.* at 31–32. Plaintiff has acknowledged receiving the notice in January 1996, and seeing the previous year's version posted on a bulletin board. *See* Wahlstrom Dep. at

---

17. *See, e.g., Donovan v. Big v. Supermarkets, Inc.*, No. 98 Civ. 2842, 1999 WL 615100, at *6 (S.D.N.Y. Aug. 12, 1999); *see also DeWitt v. Lieberman*, 48 F.Supp.2d 280, 291 (S.D.N.Y. 1999) ("[It] is undisputed that [the employer] had an effective antiharassment policy in place.... Thus, the first element of the affirmative defense is met."); *Fierro v. Saks Fifth Ave.*, 13 F.Supp.2d 481, 491 (S.D.N.Y.1998) ("[P]romulgation of an 'an antiharassment policy with complaint procedure' is an important, if not dispositive, consideration.").

18. Plaintiff's co-worker, Susan Dorien, explained that most Metro–North employees paid little attention to the memorandum, because notices distributed with paychecks were a common occurrence. "[O]ne week it's about getting your flu shot. The next week it's about their sexual harassment policy and the next week it's about being drug free and you take it and throw it away with the envelope." Dorien Dep. 44–45. Co-worker Annmarie Mahony concurred: "They staple something on our paychecks and everybody is supposed to read it and know what to do and what not to do and they don't." Mahony Dep. at 30–31.

316; *cf. Whidbee v. McDonald's Corp.*, 75 F.Supp.2d 183, 192 (S.D.N.Y.1999). Chapman also recalls receiving the memorandum and admits to having "glanced at it." Chapman Dep. at 31.

In addition, Metro–North routinely provides sexual harassment training, but only for management-level employees. All management employees and union supervisors are required to enroll in a training class once during their employment, *see* Gormley–O'Connor Dep. at 37, 230 ("Anyone with supervisory authority that could influence an employment decision [is] required to attend."), as are new hires for the assistant conductor job classification, *see id.* at 39–40.[19] However, engineers and conductors hired prior to 1996 are not required to take the course, except as a "remedial action." *Id.* at 38; *see also id.* at 222–24, 229 (explaining that non-management employees do not receive training because of limited budgetary resources). The training involves participation in a three-hour class, which is attended by between fifteen and thirty people. *See id.* at 85–86. Though there is no obligatory follow-up, individuals who have additional questions are invited to obtain counseling from the work force diversity department. *See id.* at 86.

The undisputed evidence in this case clearly demonstrates that Metro–North's policy against sexual harassment provided a reasonable avenue of complaint, of which plaintiff availed herself. Plaintiff was well aware of Metro–North's sexual harassment prevention policy, but never complained about Chapman prior to April 22, 1996. *See* Wahlstrom Dep. at 316–317; *see also Torres*, 116 F.3d at 635 ("[Plaintiff] knew about [her employer's] written sexual harassment policy, but did not file a complaint with any of the people designat-

ed to receive them."). On the very day plaintiff did report Chapman's behavior to Ms. Gormley–O'Connor, Metro–North immediately launched an investigation. Over the next forty-eight hours, Ms. Gormley–O'Connor interviewed all of the witnesses to the incident and initiated formal charges against Chapman. Therefore, it cannot be said that the investigation was untimely.

While plaintiff maintains that Metro–North merely "paid lip service to being committed to a nondiscriminatory work environment," *Kotcher*, 957 F.2d at 63, she offers no evidence to support this claim. Plaintiff insists that Metro–North's "half-hearted 'commitment' " to eradicating harassment is evident in distribution of its policy in employees' paychecks, in the same way it distributed innocuous messages such as flu shot reminders. *See* Dorien Dep. at 44–45. However, she does not propose, nor can this Court contemplate, any alternative method that would more effectively educate its employees. In fact, Metro–North's procedures are comparable to those at issue in *DeWitt*, 48 F.Supp.2d at 294, where the defendant's sexual harassment policy contained a detailed definition of sexual harassment, stated that "sanctions will be strictly enforced against offending individuals," and detailed procedures for filing a complaint. Plaintiff quibbles with the fact that not every non-managerial employee was required to undergo sexual harassment training. *See* Pl. Opp. Mem. at 16. However, Title VII does not require employers to provide such training to every employee. *See, e.g., Donovan*, 1999 WL 615100, at *6 (granting summary judgment where defendant provided sexual harassment training to all of its store managers, assistant store managers, and unionized department heads, but not to all employees).[20]

---

**19.** It should be noted that the requirement that new hires undergo sexual harassment training was not implemented until late 1996, months after the date of the incident involving plaintiff and Chapman. *See* Gormley–O'Connor Dep. at 40.

**20.** The other cases cited by plaintiff are also distinguishable. Both *Leibovitz v. New York*

*City Transit Auth.*, 4 F.Supp.2d 144, 153 (E.D.N.Y.1998), and *Crisonino*, 985 F.Supp. at 389–90, involve harassment by supervisors, as opposed to co-workers, which conduct is more easily imputed to the employer. *See Torres*, 116 F.3d at 634 (enumerating two circumstances under which an employer will be held strictly liable for harassment perpetrated by a supervisor: "(a) the supervisor

Finally, it should be noted that the Second Circuit has recently had the opportunity to scrutinize Metro–North's harassment policies and complaint procedures, and has given them its stamp of approval. In *Caridad,* 191 F.3d at 295, the Court determined that "the undisputed facts ... indicate that Metro–North endeavors to investigate and remedy problems reported by its employees." It went on to conclude that "[u]nder these circumstances, Metro–North exercised reasonable care to prevent and correct sexually harassing behavior." *Id.* Nothing in the record gives this Court pause to disagree.

Accordingly, there is no basis on which a reasonable jury could find that Metro–North did not provide a reasonable avenue of complaint. The Court thus proceeds to the question of whether Metro–North acted reasonably in response to the alleged incident.

## 2. Metro–North's Response

Plaintiff contends that, despite having knowledge of plaintiff's allegations, Metro–North did not provide an effective remedy. *See* Pl. Opp. Mem. at 18. Specifically, she notes that it took more than six weeks from the date of her report for Metro–North to reprimand Chapman for his conduct, and complains that he was neither terminated nor transferred. Essentially, her quarrel with Metro–North is that Chapman's 45-day suspension was "too little, too late." *Cf. Plumeau v. Yamhill County School Dist. #40,* 907 F.Supp. 1423, 1437 (D.Or.1995); *Ficek v. Griffith Labs. Inc.,* No. 93 C 6178, 1995 WL 42081, at *6 (N.D. Ill. Feb. 1, 1995); *Stewart v. Cartessa Corp.,* 771 F.Supp. 876, 881 (S.D.Ohio 1990).

■ An employer who is on notice of harassing behavior has a duty to "take reasonable steps to remedy it." *Distasio,* 157 F.3d at 65. The reasonableness of an employer's response must be assessed based on the totality of circumstances. *See id.* "If the evidence creates an issue of fact as to whether an employer's action is effectively remedial and prompt, summary judgment is inappropriate." *Gallagher,* 139 F.3d at 348. However, so long as the employer has taken "prompt and appropriate corrective action," *Watts,* 724 F.Supp. at 107, the remedy shall be adjudged sufficient to remove any question of fact as to the employer's liability.

■ Having considered all the evidence, the Court finds that Metro–North's response was both prompt and effective. First, as in *Van Zant,* 80 F.3d at 716, "[a]s soon as [plaintiff] informed [Gormley–O'Connor] that she was being sexually harassed by [Chapman], [Gormley–O'Connor] took substantial steps to see that [plaintiff's] complaint was taken seriously." The investigation began immediately after plaintiff complained about the incident and, within two days, all the pertinent witnesses had been interviewed. *Cf. id.* at 715. Moreover, during her interview with Chapman on April 23, Gormley–O'Connor instructed him to stay away from plaintiff warned that further harassment or retaliation would not be tolerated. *Cf. Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 154 (2d Cir.1997).

Plaintiff takes issue with the fact that it took Metro–North over six weeks to reprimand Chapman for his actions. Under Metro–North's collective bargaining agreement and federal law, Chapman was entitled to due process and a formal hearing. *See, e.g., Ladenheim v. Metro–North Commuter R.R.,* No. 91 Civ. 8026, 1994 WL 75271, at *2–*3 & n. 2 *7 & n. 17 (S.D.N.Y. Mar. 7, 1994). While the Court is mindful of the age-old maxim that "justice delayed is justice denied," *Strachan v. Colon,* 941 F.2d 128, 129 (2d Cir.1991), it lies beyond

---

was at a sufficiently high level in the company, or (b) the supervisor used his actual or apparent authority to further the harassment, or was otherwise aided in accomplishing the harassment by the existence of the agency relationship"). Here, plaintiff concedes that Chapman was not her supervisor, as he had no control over the terms or conditions of her employment. *See supra* note 1.

this Court's authority to say whether collectively bargained-for procedural requirements serve their purpose. Hence, Metro–North acted reasonably in according Chapman the process he was due.

Second, although plaintiff evidently believes Chapman should have received a more stern punishment, *see* Pl. Opp. Mem. at 19–21, nothing gives her the right to choose the penalty for her harasser. Plaintiff cites *Van Zant,* 80 F.3d at 711–12, as a case that plaintiff cites as an example of a case in which the employer provided "[a]n effective remedy." Pl. Opp. Mem. at 19. Yet, in *Van Zant,* the perpetrator was merely reprimanded and was only discharged after his employer discovered that he had failed to disclose his criminal record. In light of *Van Zant,* the Court cannot say that suspending Chapman for forty-five days and requiring him to attend a sexual harassment training course was an inadequate or inappropriate response.

Sexual harassment in the workplace is a serious issue that demands appropriate attention. To be effective, however, an employer's remedy need not necessarily expel the harasser from the work environment. Rather, it should be "sufficiently calculated to end the harassment," *Murray,* 57 F.3d at 250. As the Second Circuit has recognized, "not every response to a complaint should take the form of discharge;" even a mere written warning can be an appropriate response if it conveys the message that further harassment will not be tolerated. *Kotcher,* 957 F.2d at 63; *see also Torres,* 116 F.3d at 639 ("[R]esolution will vary from case to case."). By far the best evidence that Metro–North's response was effective is that plaintiff has not been sexually harassed by Chapman or any other Metro–North employee since meeting with Ms. Gormley–O'Connor, *see* Wahlstrom Dep. at 30, 248, nor has Chapman been accused of accosting any other employees since returning from his suspension, *see* Chapman Dep. at 64, 279; Sinigiani Dep. at 49; *cf. Murray,* 57 F.3d at 251 (holding that allegations of failure to remedy a hostile work environment provided no basis for relief where the evidence demonstrated

that the harassment had ended by the time plaintiff's complaint was filed).

Therefore, while factual issues exist as to whether Chapman's patently inappropriate behavior subjected plaintiff to a "hostile work environment," no reasonable jury could find that Metro–North neglected its obligation to take prompt and effective action to remedy the situation. Consequently, Chapman's actions cannot be imputed to Metro–North for the purposes of Title VII liability. Plaintiff's Title VII claim must therefore be dismissed.

## IV. New York State Human Rights Law Claim

 Under the NYSHRL, "an 'employer cannot be held liable for an employee's discriminatory act unless the employer became a party to it by encouraging, condoning, or approving it.'" *DeWitt,* 48 F.Supp.2d at 293 (quoting *State Div. of Human Rights v. St. Elizabeth's Hosp.,* 66 N.Y.2d 684, 687, 487 N.E.2d 268, 269, 496 N.Y.S.2d 411, 412 (1985)). Metro–North suggests that this standard imposes a stricter burden on plaintiff than does Title VII. *See Torres,* 116 F.3d at 629. The case it cites in its memorandum of law, however, clearly states that "[i]t has been established in federal and state courts in New York that the standards of proof for claims brought under the [NYSHRL] are governed by the same standards as a claim under Title VII." *Ponticelli,* 16 F.Supp.2d at 432 (citing *Reed,* 95 F.3d at 1177). The Second Circuit agrees. *See Quinn,* 159 F.3d at 765; *Torres,* 116 F.3d at 629 n. 1; *Tomka,* 66 F.3d at 1304 n. 4.

 Nevertheless, just as plaintiff cannot establish employer liability under Title VII, she cannot prevail under the NYSHRL. There is no evidence that Metro–North encouraged Chapman's behavior, nor can it be said to have approved of it, in light of its punishment of him. Plaintiff's remaining argument is that Metro–North condoned Chapman's conduct by repeatedly postponing his disciplinary hearing, permitting him to work during the interim,

and failing to adequately punish his behavior. *See* Pl. Opp. Mem. at 22–23. However, like Title VII, New York law provides that an employer can "disprove this condonation by a showing that 'the employer reasonably investigated the complaint of discriminatory conduct and took corrective action.'" *Ponticelli*, 16 F.Supp.2d at 433 (quoting *Father Belle Community Ctr. v. New York State Div. of Human Rights*, 221 A.D.2d 44, 642 N.Y.S.2d 739, 746 (4th Dep't 1996)); *see also Sowemimo*, 43 F.Supp.2d at 486; *Seepersad*, 1998 WL 474205, at *4. As discussed above, *see supra* at 525–26, the facts of this case clearly demonstrate that Metro–North's response to plaintiff's complaint was both prompt and effective. Thus, as no reasonable finder of fact could conclude that Metro–North condoned Chapman's behavior, summary judgment is appropriate on this claim as well.

## V. New York City Human Rights Law

 Plaintiff's claims under the NYCHRL must also be dismissed. As Metro–North correctly points out, the alleged incidents took place in White Plains, New York, well outside the borders of New York City. *See Dais v. Lane Bryant, Inc.*, 97 Civ.2011, 2000 WL 145755, at *2 n. 4 (S.D.N.Y. Feb. 8, 2000) (Leisure, J.); *Casper v. Lew Lieberbaum & Co.*, 1998 WL 150993, at *4 (S.D.N.Y. Mar. 31, 1998); *Wishner v. Continental Airlines*, No. 94 Civ. 8239, 1997 WL 420286, at *8 (S.D.N.Y.

July 25, 1997); *see also Levy v. City Comm'n on Human Rights*, 85 N.Y.2d 740, 743, 628 N.Y.S.2d 245, 246–47, 651 N.E.2d 1264, 1265–66 (1995) ("The Administrative Code of the City of New York vests in the New York City Commission on Human Rights the authority and jurisdiction to eliminate and prevent discrimination within the City of New York."). The only allegation of sexual harassment that occurred in New York City was Chapman's final statement to plaintiff: "You better shape up, Corinne, or you're going to get it." Wahlstrom Dep. at 271, 481–82. This statement, standing alone, hardly constitutes sexual harassment, let alone a hostile work environment.[21]

Plaintiff maintains that the NYCHRL is applicable nevertheless because Metro–North's equal employment opportunity polices are distributed from its New York City offices, *see* Koenigsberg Decl., Exh. T, as were the decisions to schedule, adjourn, and reschedule Chapman's disciplinary hearing, *see id.*, Exhs. G–J. This argument has been explicitly rejected, however, by courts in this District that have held that the NYCHRL only applies where the actual impact of the discriminatory conduct or decision is felt within the five boroughs, even if a discriminatory decision is made by an employer's New York City office. *See Duffy v. Drake Beam Morin, Harcourt Gen., Inc.*, No. 96 Civ. 5606, 1998 WL 252063, at *11 (S.D.N.Y. May 19, 1998) ("To hold otherwise would be to

---

**21.** Metro–North also contends that plaintiff's NYCHRL claims should be dismissed pursuant to section 1266(8) of the New York State Public Authorities Law. *See Robinson v. Metro–North Commuter R.R. Co.*, Nos. 94 Civ. 7374, 95 Civ. 8594, 1998 WL 17742, at *10 (S.D.N.Y. Jan. 16, 1998). That statute, in referring to Metro–North's parent, the Metropolitan Transit Authority ("MTA"), provides that "no municipality of political subdivision ... shall have jurisdiction over any facilities of the [MTA] or any of its activities or operations. The local laws, resolutions, ordinances, rules and regulations of a municipality or political subdivision ... conflicting with this title or any rule or regulation of the [MTA], shall not be applicable to the activities or operation of the [MTA]...." Plaintiff re-

sponds that this argument was explicitly rejected by the New York State Court of Appeals in *Levy*, 85 N.Y.2d at 746, 628 N.Y.S.2d at 249, 651 N.E.2d at 1268 (1995) ("Administrative Code § 8–107(1)(a) is not inconsistent with ... the Public Authorities Law, and manifestly, the Legislature has not preempted the area of human rights because it has expressly recognized the concurrent jurisdiction of the City Commission on Human Rights with respect to matters in New York City."). Evidently, the *Robinson* Court failed to consider this holding. *See Robinson*, 1998 WL 17742, at *10 ("Plaintiffs have nowhere responded to this argument, nor does the Court perceive any valid response."). As such, this Court follows *Levy* in holding that Metro–North is not exempt from the NYCHRL.

expand the [NYCHRL] to cover any employee who is fired pursuant to a decision handed down by an employer from its New York City headquarters, no matter where the employee in question actually works."); *Lightfoot v. Union Carbide Corp.*, No. 92 Civ. 6411, 1994 WL 184670, at *5 (S.D.N.Y. May 12, 1994) (dismissing NYCHRL claim where the employer's early retirement plan was "approved at a meeting in New York City," because "[i]ts impact on [plaintiff] ... occurred while he was employed in Connecticut"), *aff'd*, 110 F.3d 898 (2d Cir.1997).[22] Therefore, plaintiff's NYCHRL claim is also dismissed.

## VI. Plaintiff's State Common Law Claims Against Chapman

In a separate motion, Chapman seeks summary judgment in his favor on four of plaintiff's five state common law claims. He does concede, though, that given the parties' factual dispute over whether the alleged incident took place, plaintiff's battery claim must be submitted to a jury for its consideration.

### A. Assault

■ Chapman first contends that plaintiff's cause of action for assault must be dismissed because she cannot demonstrate having suffered any apprehension of an imminent harmful bodily contact—one of the essential elements of a common law assault claim. An 'assault' is "an intentional placing of another person in fear of imminent harmful or offensive contact." *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.*, 994 F.2d 105, 108 (2d Cir. 1993). The plaintiff must show that the

defendant intended "either to inflict personal injury or to arouse apprehension of harmful or offensive bodily contact." *Rivera v. Puerto Rican Home Attendants Servs., Inc.*, 930 F.Supp. 124, 133 (S.D.N.Y.1996). Thus, although plaintiff need not prove actual contact, she must allege some "physical menace against [her] body." *Prince v. Ridge*, 32 Misc. 666, 66 N.Y.S. 454, 455 (Sup.Ct.1900) (holding that an "effort of the defendant by words of persuasion alone to induce the plaintiff to grant him the favor of sexual intercourse" was not an assault).

■ Chapman is correct that actions that are discourteous but that do not create apprehension of imminent harmful or offensive contact do not constitute an assault. *See Hayes v. Schultz*, 150 A.D.2d 522, 541 N.Y.S.2d 115, 116 (2d Dep't 1989); *Griffin v. William Mercer, Inc.*, No. 101146/96, 1998 WL 1050968, at *12 (N.Y.Sup.Ct. Mar. 25, 1998). He is wrong, however, in his assertion that plaintiff's claim is "based purely upon [his] alleged words which she herself acknowledges were unaccompanied by any contemporaneous and overt act." Chapman Mem. at 5. In fact, plaintiff alleges that Chapman grabbed her from behind, put her in a bear hug, grabbed and squeezed her buttock, and slapped it three times. *See* Wahlstrom Dep. at 252. New York's Appellate Division, First Department has found such conduct sufficient to state a cause of action for assault, *see Jaffe v. National League for Nursing*, 222 A.D.2d 233, 635 N.Y.S.2d 9, 9 (1st Dep't 1995), and this Court does not disagree. It is this alleged intentional

---

**22.** The state court cases upon which plaintiff relies do not contradict *Duffy* and *Lightfoot*. In *Batchelor v. NYNEX Telesector Resources Group*, 213 A.D.2d 189, 623 N.Y.S.2d 235, 235 (1st Dep't 1995), the First Department "agree[d] with the IAS Court that plaintiff's allegation that '[t]he offices of [defendant] relevant to this complaint' are located in New York City and White Plains, New York, is sufficient, for pleading purposes, to show that at least part of the activity complained of took place in New York City, and is thus cognizable under the [NYCHRL]." Yet, the Court did not discuss what occurred in the defendant's

New York City offices, nor even the nature of the plaintiff's claim. Thus, not only is *Batchelor* not binding on this Court, its holding is too ambiguous to provide significant guidance. Plaintiff also cites *Walston & Co. v. New York City Comm'n on Human Rights*, 41 A.D.2d 238, 342 N.Y.S.2d 459, 463 (1st Dep't 1973). Notwithstanding plaintiff's interpretation of that decision, however, the First Department there concluded that "the record [was] too incomplete to make an informed determination as to whether the Commission has jurisdiction because the alleged acts of discrimination occurred in New York." *Id.*

physical contact—not plaintiff's crass comments—that precludes summary judgment on plaintiff's assault claim. *See Masters v. Becker*, 22 A.D.2d 118, 254 N.Y.S.2d 633, 635 (2d Dep't 1964) ("A plaintiff in an action to recover damages for an assault founded on bodily contact must prove only that there was bodily contact; that such contact was offensive; and that the defendant intended to make the contact.").

## B. Intentional Infliction of Emotional Distress

■ A cause of action for intentional infliction of emotional distress under New York law has four elements: "(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir.1999). Moreover, there will be no liability unless "'the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.'" *Id.* (quoting *Howell v. New York Post Co.*, 81 N.Y.2d 115, 122, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993)). Whether the conduct alleged may reasonably be regarded as sufficiently outrageous and extreme to permit recovery is a matter for the Court to decide. *See id.*

■ Chapman's first contention is that plaintiff's claim is deficient because she has failed to establish that his conduct was intended to cause severe emotional distress. *See* Chapman Mem. at 5–6. Indeed, he notes, plaintiff has testified that she did not know what Chapman's motivation was. *See* Wahlstrom Dep. at 448–49. This argument fails, however, because plaintiff need not show that Chapman actually intended to; cause her emotional harm. *See Galella v. Onassis*, 353 F.Supp. 196, 230 (S.D.N.Y.1972), *aff'd in relevant part*, 487 F.2d 986 (2d Cir.1973); *Mitran v. Williamson*, 21 Misc.2d 106, 197 N.Y.S.2d 689, 692 (Sup.Ct.1960). Plaintiff

is only required to allege facts "giv[ing] rise to a clear inference they were intended to cause severe emotional distress." *Persaud v. S. Axelrod Co.*, No. 95 Civ. 7849, 1996 WL 11197, at *4 (S.D.N.Y. Jan. 10, 1996); *see also Doe v. Allstate Ins. Co.*, 187 A.D.2d 181, 596 N.Y.S.2d 603, 605 (4th Dep't 1993) ("Abuse, regardless of the form it takes, must be deemed intentional. Such conduct is inherently harmful and an intent to injure must be inferred as a matter of law."). The question of intent is not for the Court to decide; it is within the province of the jury. *See Persaud*, 1996 WL 11197, at *4 n. 8.

■ Second, Chapman characterizes plaintiff's claim as "involv[ing] nothing more than hurt feelings, insults, indignities, threats and annoyances which are not actionable as an intentional infliction of emotional distress." Chapman Mem. at 7. Nonetheless, sexual harassment can, if sufficiently outrageous and extreme, give rise to a claim for intentional infliction of emotional distress. *See Funk v. F&K Supply*, 43 F.Supp.2d 205, 219–20 (N.D.N.Y. 1999). In fact, "[i]n the employment context, sexual harassment cases comprise the bulk of intentional infliction of emotional distress actions where plaintiffs prevail." *Salvatore v. KLM Royal Dutch Airlines*, No. 98 Civ. 2450, 1999 WL 796172, at *2 (S.D.N.Y. 1999); *see also Seepersad*, 1998 WL 474205, at *6; *Bonner v. Guccione*, 916 F.Supp. 271, 276 (S.D.N.Y.1996). To be actionable, the conduct complained of must be particularly "outrageous in character" and "extreme in degree." *Martin v. Citibank, N.A.*, 762 F.2d 212, 220 (2d Cir. 1985).

Consequently, in the "rare instances" where New York courts have recognized a claim for intentional infliction of emotional distress in the employment context, the claims have alleged not merely sexual harassment, but "more significantly, battery." *Gerzog v. London Fog Corp.*, 907 F.Supp. 590, 604 (E.D.N.Y.1995) (citing *Koster v. Chase Manhattan Bank, N.A.*, 609 F.Supp. 1191, 1198 (S.D.N.Y.1985)

(Leisure, J.) (finding conduct sufficiently outrageous where employer forced plaintiff into an ongoing sexual relationship); *O'Reilly v. Executone, Inc.,* 121 A.D.2d 772, 503 N.Y.S.2d 185, 186 (3d Dep't 1986) (affirming denial of motion to dismiss where plaintiff had been subjected to physical sexual contact, jokes, pornography, and erotica); *Collins v. Willcox, Inc.,* 158 Misc.2d 54, 600 N.Y.S.2d 884, 885–86 (Sup. Ct.1992) (holding that "a pattern of behavior that continually put [plaintiff] in embarrassing, humiliating and demeaning positions" that included sexual harassment and battery "might well rise to the level of outrageous")); *see also Salvatore,* 1999 WL 796172, at \*2–\*3 (finding that plaintiffs who alleged episodes of harassment, including "minor physical abuse," had stated claims for intentional infliction of emotional distress); *Sowemimo,* 43 F.Supp.2d at 491 ("Courts have observed that a plaintiff must allege sexual battery in order to survive . . . summary judgment in the sexual harassment context. By claiming that [defendant] groped her breast, [plaintiff] has raised an issue of fact as to whether [defendant's] conduct rises to the level demanded under New York law."); *Archer v. Economic Opportunity Comm'n,* 30 F.Supp.2d 600, 609–10 (E.D.N.Y.1998) (denying summary judgment on plaintiff's allegation of "a single incident of harassment . . . involving actual unwanted sexual contact"); *Rivera v. Prudential Ins. Co.,* Nos. 95–CV–0829, 95–CV–0830, 1996 WL 637555, at \*15 (N.D.N.Y. Oct. 21, 1996) (refusing to dismiss intentional infliction of emotional distress claim where plaintiffs alleged that defendant grabbed their buttocks and directed lewd comments toward them); *Persaud,* 1996 WL 11197, at \*4

("[T]he actions alleged, *particularly the assaults,* give rise to a clear inference that they were intended to cause severe emotional distress.") (emphasis added).[23] As Chapman concedes the existence of a material fact as to whether he committed a sexual battery, this is one of those "rare instances" where a cause of action will lie.

Cases cited by Chapman bear little resemblance to the facts at hand, for in none of those cases was there any indication that the alleged assault was of a sexual nature. For instance, in *Jaffe,* 635 N.Y.S.2d at 9, the court held that the plaintiff's allegations, which included "'a hard slap on [plaintiff's] backside,' during an outburst of rage," "f[ell] short of the rigorous standard of outrageous conduct necessary to maintain a cause of action for intentional infliction of emotional distress." While the defendant was clearly angry, nothing in the court's opinion suggests that his action was sexually-motivated. Likewise, in a similar case not cited by Chapman, *Ponticelli,* 16 F.Supp.2d at 440, the Court held that plaintiff's allegations did not rise to the level of extreme and outrageous conduct where the only incident of touching she alleged—being pushed into a filing cabinet—was not a sexual assault. *See also Lucas,* 54 F.Supp.2d at 151 (dismissing intentional infliction of emotional distress claim where plaintiff alleged that defendant's hand briefly touched his hand, shoulder, and back on a handful of occasions, but did not assert that defendant "ever touched or attempted to touch his private parts"); *Castro v. Local 1199,* 964 F.Supp. 719, 731, 732–33 (S.D.N.Y.1997) (granting summary judgment where the defendant was ac-

---

**23.** *See also Funk,* 43 F.Supp.2d at 216, 219–20; *Casper,* 1998 WL 150993, at \*10; *Kudatzky v. Galbreath Co.,* No. 96 Civ. 2693, 1997 WL 598586, at \*12 (S.D.N.Y. Sept. 23, 1997); *Shapiro v. AEO/Ricoh, Inc.,* No. 96 Civ. 7274, at \*5, 1997 WL 452026 (S.D.N.Y. Aug. 7, 1997); *Olszewski v. Bloomberg, L.P.,* No. 96 Civ. 3393, 1997 WL 375690, at \*7–\*8 (S.D.N.Y. July 7, 1997); *Bonner,* 916 F.Supp. at 276–78; *Randall v. Tod–Nik Audiology, Inc.,* 704 N.Y.S.2d 228, 2000 WL 261041, at

\*1 (1st Dep't Mar. 7, 2000); *Murphy v. ERA United Realty,* 251 A.D.2d 469, 674 N.Y.S.2d 415, 418 (2d Dep't 1998); *Carter v. Andriani,* 84 A.D.2d 513, 443 N.Y.S.2d 157, 158 (1st Dep't 1981); *cf. Nunez v. A–T Fin. Info., Inc.,* 957 F.Supp. 438, 442–43 (S.D.N.Y.1997) (holding that conduct that was "boorish, vulgar, and reprehensible" was not actionable since it was unaccompanied by physical threats or abuse).

cused of threatening and screaming at the plaintiff, but not physical—let alone sexual—contact).

Accordingly, since the alleged harassment in the instant action included a sexual battery, the Court cannot say that such conduct did not, as a matter of law, constitute intentional infliction of emotional distress. Therefore, "a determination as to whether particular conduct is sufficiently outrageous, atrocious or intolerable ... must be left to jury." *Collins*, 600 N.Y.S.2d at 886.

## C. Negligent Infliction of Emotional Distress

■ Under New York law, a plaintiff may recover for negligent infliction of emotional distress under one of two theories: (1) the "bystander theory" or (2) the "direct duty theory." *United States* ex rel. *Ben–Shlush v. St. Luke's–Roosevelt Hosp.*, No. 97 Civ. 3664, 2000 WL 269895, at *4 (S.D.N.Y. Mar. 10, 2000); *see also Mortise v. United States*, 102 F.3d 693, 696 (2d Cir.1996). Plaintiff clearly has no cause of action under the "bystander theory," which requires that she have witnessed the death or serious bodily injury of a member of her immediate family. *See Mortise*, 102 F.3d at 693. Thus, the Court construes plaintiff's claim to rest on the "direct duty theory," under which she must show that she "suffer[ed] an emotional injury from [Chapman's] breach of a duty which unreasonably endangered her own physical safety," *id.* at 693, or caused her to fear for her physical safety, *see Johnson v. New York City Bd. of Educ.*, 704 N.Y.S.2d 281, 2000 WL 277143, at *2 (N.Y.2d Dep't Mar. 13, 2000). The duty alleged "must be specific to the plaintiff, and not some amorphous, free-floating duty to society." *Mortise*, 102 F.3d at 693.

■ As an initial matter, in order to recover for her emotional injuries, plaintiff must demonstrate that she experienced "contemporaneous or consequential physical harm." *Bertuzzi v. Chase Manhattan Bank, N.A.*, No. 98 Civ. 5968, 1999 WL 759997, at *7 n. 3 (S.D.N.Y. Sept. 24,

1999); *Iannotti v. City of Amsterdam*, 225 A.D.2d 990, 639 N.Y.S.2d 537, 538 (3d Dep't 1996). Although general allegations of sexual harassment are insufficient to state a claim for negligent infliction of emotional distress, a cause of action may lie where the conduct at issue included "sexual assault or battery, or threat thereof." *Gerson v. Giorgio Sant'Angelo Collectibles, Inc.*, 176 Misc.2d 388, 671 N.Y.S.2d 958, 961 (Sup.Ct.1998); *see also Stewart v. Florence Nightingale Health Ctr.*, No. 97 Civ. 6977, 1999 WL 179373, at *13 n. 6 (S.D.N.Y. Mar. 31, 1999). Plaintiff has raised a genuine issue as to whether her assailant placed her in reasonable apprehension of physical harm. *See supra* at 518–19. Hence, this prerequisite has been satisfied.

■ Nevertheless, plaintiff's negligent infliction of emotional distress claim must fail for two reasons. First, plaintiff has not alleged any special duty owed to her by Chapman "other than the duty to obey the law." *Kojak v. Jenkins*, No. 98 Civ. 4412, 1999 WL 244098, at *9 (S.D.N.Y. Apr. 26, 1999) (dismissing claim for negligent infliction of emotional distress where defendant, an attorney at the law firm at which plaintiff was employed as a word processor, invited plaintiff to engage in sexual acts and sent her sexually explicit letters); *see also Mortise*, 102 F.3d 693 ("While the [defendants] may have had a generalized duty to prevent unreasonable risks of harm to passers-by, this duty was not specific to the [plaintiffs]."); *Drankwater v. Miller*, 830 F.Supp. 188, 191 n. 5 (S.D.N.Y.1993) (dismissing claim *sua sponte* where plaintiff's employer's CEO and majority shareholder allegedly made comments that constituted sexual harassment); *Cucchi v. New York City Off–Track Betting Corp.*, 818 F.Supp. 647, 656 (S.D.N.Y.1993) (finding no special relationship because plaintiff's employer had no obligation to treat her differently than all other employees). Second, because the actions alleged here were "intentional and deliberate and allegedly in their nature

offensive," they are "outside the ambit of actionable negligence." *Jones v. Trane,* 153 Misc.2d 822, 591 N.Y.S.2d 927, 929 (Sup.Ct.1992); *see also* Prosser & Keeton, *Prosser and Keeton on the Law of Torts* § 10, at 46 (5th ed. 1984) ("There is, properly speaking, no such thing as a negligent assault."). This Court is mindful that "New York Courts have rejected uniformly such attempts to transmogrify intentional torts into 'negligence.'" *Schmidt v. Bishop,* 779 F.Supp. 321, 324–25 (S.D.N.Y.1991) (dismissing negligence claim by plaintiff who alleged that her priest sexually abused her); *see also Wilson v. Diocese of N.Y. of Episcopal Church,* No. 96 Civ. 2400, 1998 WL 82921, at *6 (S.D.N.Y. Feb. 26, 1998) (citing cases). For these reasons, plaintiff's negligent infliction of emotional distress claim shall be dismissed.

## D. *Prima Facie* Tort

 Finally, plaintiff alleges that Chapman's conduct toward her renders him liable for *prima facie* tort under New York law. The elements of *prima facie* tort are: "(1) intentional infliction of harm; (2) resulting in special damages; (3) without excuse or justification; (4) by an act that would otherwise be lawful." *Twin Labs., Inc. v. Weider Health & Fitness,* 900 F.2d 566, 571 (2d Cir.1990) (citing *Burns Jackson Miller Summit & Spitzer v. Lindner,* 59 N.Y.2d 314, 332, 451 N.E.2d 459, 467, 464 N.Y.S.2d 712, 720 (1983)). The Second Circuit has held that the "touchstone" of such a claim is "disinterested malevolence," meaning that "the defendant's conduct was not only harmful,

but done with the sole intent to harm." *Id.* As a result, evidence of motives other than disinterested malevolence, "such as profit, self-interest, or business advantage" will defeat a claim of *prima facie* tort. *Marcella v. ARP Films, Inc.,* 778 F.2d 112, 119 (2d Cir.1985).[24] Though Chapman does not address this issue, plaintiff's Complaint makes no allegation that "disinterested malevolence" was the sole motivating force behind his actions. *See Ross,* 2 F.Supp.2d at 531; *ESI, Inc. v. Coastal Power Prod. Co.,* 995 F.Supp. 419, 435 (S.D.N.Y.1998); *Burns Jackson,* 59 N.Y.2d at 333, 464 N.Y.S.2d 712, 451 N.E.2d 459.

Moreover, plaintiff's Complaint is insufficient to state a cause of action for *prima facie* tort insofar as it fails to plead special damages. To establish such a claim, plaintiff's special damages "must be alleged 'fully and accurately ... with sufficient particularity as to identify and causally relate the actual losses to the allegedly tortious acts.'" *Montefusco v. Nassau County,* 39 F.Supp.2d 231, 239 (E.D.N.Y.1999) (quoting *Broadway & 67th St. Corp. v. City of New York,* 100 A.D.2d 478, 475 N.Y.S.2d 1, 6 (1st Dep't 1984)) (alteration in original); *see also ESI,* 995 F.Supp. at 435 ("Pleading special damages requires 'a particularized statement of the reasonable, identifiable and measurable' loss.") (quoting *Gray v. Grove Mfg. Co.,* 971 F.Supp. 78, 81 (E.D.N.Y.1997)).

Plaintiff has not only failed to itemize her losses, *see Procter & Gamble Co. v. Quality King Distribs., Inc.,* 974 F.Supp. 190, 198 (E.D.N.Y.1997); *Gray,* 971 F.Supp. at 81, her prayer for relief does

---

**24.** Chapman argues that, because he has acknowledged the existence of disputed issues of material facts concerning plaintiff's battery claim, her *prima facie* tort claim must be dismissed. *See* Chapman Rep. Mem. at 8. However, while New York law prevents recovery for both a traditional and a *prima facie* tort, it does not preclude alternative pleading. *See Hughes v. Patrolmen's Benevolent Ass'n,* 850 F.2d 876, 882 (2d Cir.1988); *see also Freihofer v. Hearst Corp.,* 65 N.Y.2d 135, 143, 490 N.Y.S.2d 735, 741 480 N.E.2d 349, 355 (1985) ("[W]here a traditional tort remedy

exists, a party will not be foreclosed from pleading, as alternative relief, a cause of action for prima facie tort."); *Board of Educ. v. Farmingdale Classroom Teachers Ass'n,* 38 N.Y.2d 397, 406, 380 N.Y.S.2d 635, 645, 343 N.E.2d 278, 284 (1975). Hence, even though Chapman has conceded that the battery claim must be submitted to the jury, the *prima facie* tort claim does not "disappear[]" until "a traditional tort is *established.*" *Curiano v. Suozzi,* 63 N.Y.2d 113, 116, 480 N.Y.S.2d 466, 469, 469 N.E.2d 1324, 1327 (1984) (emphasis added).

not even specify a "round sum," *see PI, Inc. v. Ogle,* No. 95 Civ. 1723, 1997 WL 37941, at *3 (S.D.N.Y. Jan. 30, 1997); *see also Matherson v. Marchello,* 100 A.D.2d 233, 473 N.Y.S.2d 998, 1001 (2d Dep't 1984) (holding that even " '[r]ound figures' or a general allegation of a dollar amount as special damages do not suffice"). In fact, in response to Chapman's interrogatories, plaintiff conceded that she "is not claiming special damages." Pl. Resp. to Def. First. Interrogs. ¶ 9 (Chapman Mem., Exh. C). Accordingly, because her Complaint does not state a cause of action for *prima facie* tort, this claim too must be dismissed. *See Walther v. Maricopa Int'l Inv. Corp.,* No. 97 Civ. 4816, 1998 WL 689943, at *3 (S.D.N.Y. Sept. 30, 1998); *Kurschus v. PaineWebber, Inc.,* 16 F.Supp.2d 386, 395 (S.D.N.Y.1998) (Leisure, J.); *Ross,* 2 F.Supp.2d at 532.[25]

### CONCLUSION

For the foregoing reasons, defendant Metro–North's motion for summary judgment is HEREBY GRANTED with respect to plaintiff's Title VII, NYSHRL, and NYCHRL claims, and HEREBY DENIED with respect to plaintiff's FELA claims. Defendant Chapman's motion for summary judgment is HEREBY GRANTED with respect to plaintiff's negligent infliction of emotional distress and *prima facie* tort claims, and HEREBY DENIED with respect to plaintiff's assault and intentional infliction of emotional distress claims. The parties are ordered to appear before this Court at the United States Courthouse, 500 Pearl Street, Courtroom 18B, New York, New York, on Thursday, April 13, 2000, at 10:30 a.m. for a pre-trial conference.

**SO ORDERED**

---

**25.** Cited by plaintiff, *Scheman v. Schlein,* 35 Misc.2d 581, 231 N.Y.S.2d 548, 552 (Sup.Ct. 1962), is not to the contrary. In that case, the court held that the counterclaim at issue established a cause of action for a traditional tort and thus did not "invoke the concept and remedy of *prima facie* tort." *Id.* at 551. Thus, any discussion of special damages must be considered dicta.